THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH PISCOTTI, Defendant-Appellant.

First District (5th Division) No. 84—0829

Opinion filed August 30, 1985.—Rehearing denied September 24, 1985.

PINCHAM, J., specially concurring.

Charles A. Pat Boyle, of Charles A. Boyle & Associates, Ltd., and Barry A. Spevack, of Monico & Pavich, Ltd., both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Peter D. Fischer, and Timothy W. Heath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and aggravated arson and sentenced to consecutive terms of 40 and 20 years, respectively. On appeal, he contends that (1) his inculpatory statements should have been suppressed; (2) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (3) he was denied a fair trial by prosecutorial misconduct throughout trial and during closing arguments; and (4) the trial court abused its discretion in imposing consecutive sentences.

The charges arose from the strangulation death of Karen Przekwis (Karen) and the subsequent arson of her apartment. At the pretrial hearing on defendant's motion to suppress certain statements he made, Officer Vallandingham testified that when he and his partner, Officer Riordan, went to defendant's home—at about 4 p.m. on the day after the murder—and asked him if he would be willing to answer some questions about Karen's fiance, Rick Sanders, he voluntarily agreed to accompany them to the police station. Upon arriving there, defendant was placed in an interview room, but was neither handcuffed nor otherwise restrained during the initial interview, which lasted until about 5:30 p.m., when technicians from the bomb and arson unit arrived and tested defendant for smoke and accelerant fumes. He did not question defendant again until about 8:30 p.m., prior to which he brought him a sandwich and a can of soda and informed him of his *Miranda* rights. Defendant did not request an attorney or ask for permission to telephone his father. At approximately 10 p.m., he readvised defendant of his *Miranda* rights, after which defendant voluntarily gave a statement regarding the murder. He then called the assistant State's Attorney and, at about 11:30 p.m., handcuffed defendant—for the first time—to a ring on the wall of the interview room. At no time did he, Riordan or anyone else in his presence strike defendant, threaten to beat or kill him if he refused to confess or promise to arrange for his probation if he did.

Officer Riordan also testified that no one ever hit defendant or threatened him in order to extract a confession or made any promises regarding probation in exchange therefor. Although he did tell defendant's father that their only purpose in asking defendant to accompany them to the police station was to question him about Rick Sanders, he did not recall also telling him that he need not come along because defendant would be driven home within an hour. He acknowledged speaking to defendant's father on the telephone later that evening while defendant was being questioned and then again at about 4 a.m., when he called to notify him that defendant had confessed to and was being charged with this murder. He also spoke to defendant's family when they came to the police station requesting to see defendant, but he did not promise them that they would be able to do so.

Assistant State's Attorney Morask testified that he arrived at the police station at about 2 a.m., identified himself to defendant, gave him the standard *Miranda* warnings and inquired as to his treatment by the police. Defendant responded that he understood his constitutional rights, had been treated well by the police and was willing to give a statement; he did not, however, request to speak to an attorney or make any telephone calls. Neither he nor anyone else, to his knowledge, struck or threatened defendant or promised him leniency in return for a confession.

Doctor Tulsiak testified that defendant was brought to the Mercy Hospital emergency room at about 7:15 p.m. on April 29, 1983, complaining of upper abdominal pain. However, the results of the physical examination he performed disclosed nothing to account therefor, and when he asked defendant whether he had fallen or been struck, defendant responded in the negative. He saw no cuts, bruises or scratches on defendant's body nor any blood on or around his mouth and indicated on his report that defendant was alert and in no apparent distress.

Felix Piscotti, defendant's father, testified that although he told Officers Vallandingham and Riordan that he wished to accompany defendant to the police station, they discouraged him, saying that defendant would be driven home within an hour. Two hours later, he sent his younger son to the police station to find out why defendant had not yet returned home, but the police chased him out without an explanation. When he and his wife went there, at about 8 p.m., Riordan, who looked very untidy and had blood on his shirt, told them that they could not see defendant because he was still being questioned but that he was not being charged with anything and would return home soon. He called the station twice more that evening, but

each time was told that defendant was busy and could not come to the telephone. The first time he was allowed to speak to his son was at about 5:30 the following morning, when Riordan called to tell him that defendant had confessed to this murder. Later that morning, he went to the lockup where defendant was being held but was told that he could not see him until after the change of shifts. Describing defendant's appearance when he was finally allowed to see him—at about 2 p.m.—Mr. Piscotti stated that there were red marks on his shoulders, chest and across the left side of his chin, his teeth were missing and his mouth was bloody. Joanne Piscotti, defendant's mother, was not at home when he left the house with the police, but her testimony was otherwise essentially the same as that of her husband.

Jerome Bokina testified that when he saw defendant at the police station at about 3 a.m., he was handcuffed and slumped over a table, his eyes were full of tears and there was blood on the left side of his mouth. On cross-examination, Bokina conceded that he had not mentioned the blood when he talked to the assistant State's Attorney the previous day.

Defendant testified that when he arrived at the police station, he was photographed, placed in an interview room and then questioned about Rick Sanders. After two officers from the bomb and arson unit tested him for smoke and/or accelerant fumes, he asked to be allowed to go home or at least telephone his parents, but Riordan ordered him to sit down, told him that he could not make any telephone calls, handcuffed him to the wall and resumed the interrogation. Later that evening, the officers placed him in a different room, handcuffed him again and then asked him detailed questions about this murder. When he told them that he was at home that night and that he knew nothing about the crime, Riordan struck him in the face. He then refused to answer any more questions and requested to speak to an attorney or to his father but was not allowed to do so. When Riordan left the room, Vallandingham advised him to "make it easy" on himself by cooperating. In addition to Riordan, two other officers, whose names he did not know, also struck him several times while Vallandingham and Riordan were out of the room. At about 11 p.m., Riordan hit him on the side of his face with a revolver, chipping two of his teeth—which were later removed by a dentist at the jail—causing him to bleed. Riordan also put a gun to his head and threatened to kill him, saying, "The bitch is dead, we want somebody to take the rap," after which he promised him that if he confessed he would receive probation. Although he told them that he would not confess because he did not kill

Karen, after repeated threats, which caused him to fear for his life and the well-being of his family, he gave them the statement they demanded. He denied telling the assistant State's Attorney that the police treated him well, testifying that he was repeatedly struck about the head, chest, arms, back and thighs and was given only one can of soda throughout the several hours of interrogation. After speaking to his father at about 5 a.m., he was left handcuffed to the wall by both arms until being transported to the lockup. He told the guard there that he had had an accident and was in pain and, later, that he had been abused and wanted to see a doctor, but it was not until six or seven hours later that a police officer he knew arranged for him to be taken to the hospital. Although the doctor who examined him commented that he looked like he had been in a fight, he did not tell him that the police attacked him because the two officers who brought him to the hospital were in the examining room and he was afraid that they too would beat him him once they left the hospital.

On cross-examination, defendant stated that altogether, he was struck 15 to 20 times, including four or five times in the head with a billy club, two or three times in the face and once across the mouth with a gun. He explained that although he had marks on his face therefrom, they were covered by his beard and, therefore, not visible in the photographs which had been taken the following night at the county jail. He told Doctor Tulsiak that he was hit and showed him the cracked teeth but did not tell him how it happened; he did, however, tell the dentist who treated him at the jail that the police struck him. After arguments by counsel, defendant's motion to suppress his statements was denied by the trial court.

At trial, Karen's mother, Theresa Przekwis, testified that Karen and Rick Sanders lived together in one of the apartments in a four-flat building she owned near 31st and May streets in Chicago. When Karen called her, at about 10:40 on the night of the murder, explaining that Sanders had just left and she disliked being alone, she told Karen that she was watching "Quincy" on television and would call her back when the program was over, but Karen told her that she was planning to take a mild sedative and go to bed early. At approximately 2:30 a.m. she received a telephone call from a neighbor informing her of a fire in the building where Karen and Rick lived, but it was not until the following afternoon that she learned Karen had not died in the fire, but had been murdered prior thereto.

Officer Wenskus testified that at about 2 a.m. on April 18, 1983, he and his partner responded to a call of a fire in an apartment building on 31st and May streets. When they arrived and saw smoke com-

ing out of the first-floor apartment, they awakened the residents of the other apartments and then waited for firefighters to arrive. Upon entering the building after the fire was extinguished, they found Karen's partially clothed, charred body lying on the floor of the rear bedroom. At the time they delivered the body to the morgue, they did not know what had caused her death.

Rick Sanders, a self-employed truck driver, testified that at about 1 p.m. on the day of the murder, he received a call from his trucking broker asking whether he would be available to drive a trailer of liquor to Cincinnati later that night—a one-day trip for which he would be paid $400. Agreeing to take the job because he and Karen needed the money to get married, he picked up the loaded trailer, ate dinner and then slept for a few hours before leaving at about 10 or 10:30 that night. After stopping in Calumet City, at about 11 p.m., to fuel the truck, he drove on to Cincinnati, arriving there at about 5 a.m., Chicago time. Since the delivery was not due for another 1½ hours, he stopped at a restaurant for some coffee and then slept for about an hour. When he arrived at the delivery location, at about 7 a.m., the dock personnel advised him that there had been a telephone call for him regarding an emergency at home. When he telephoned Karen's mother, her (Karen's) aunt informed him that there had been a fire in his apartment, that "it was bad" and that he should come home immediately. Since the aunt refused to provide any further information, it was not until he was met at the airport by several members of Karen's family that he learned she was dead. After stopping at Karen's mother's house, he went to the apartment and was taken from there by the police to Area 3 headquarters where he remained until about 10:30 that night. On cross-examination, Sanders denied ever striking Karen, stating that they did not argue or fight. He also stated that although the drive from Chicago to Cincinnati normally takes between six and seven hours, he "made good time" that night, arriving between 4:30 and 5 a.m.—approximately six hours after leaving the apartment.

Officer Vallandingham testified that he reported for duty at about 8:30 a.m., and although the previous shift's log indicated there had been a fire and death during the night, he did not learn that it was a homicide until after receiving the results of the autopsy from the medical examiner's office later that morning. When he examined the body at the morgue, he noticed extensive charring of the left side and multiple bruises about the face and lower jaw area. He and his partner then brought Sanders to the police station, where they spoke to him for almost an hour, during which he requested and was permitted

to make a telephone call. Vallandingham then reiterated his testimony regarding their visit to defendant's home and his agreement to accompany them to the police station. He further testified that during the first conversation with him, defendant—who was not then a suspect—stated that he knew Sanders for about 2½ years and Karen for about six months, and, contrary to the statements of others whom they interviewed, portrayed their relationship as a tumultuous one, stating that they argued frequently and that Sanders sometimes struck her. During that first interview, defendant also said that he went to their apartment at about 8 p.m. the previous evening to invite Sanders out for a few drinks but when Sanders refused because of the scheduled trip, he (defendant) drove to the home of his friend, Jerome Bokina, in Midlothian where he spent the remainder of the evening playing cards and then slept overnight. Although he did not inform defendant of the cause of Karen's death, at one point, defendant commented that Karen was a nice girl and "it was a shame she was strangled." When he asked defendant how he knew that, defendant replied that he had heard it on the morning news. He also said that it was reported that she had been raped and volunteered to submit to a semen test. Shortly thereafter, when Riordan asked to see his arm, defendant displayed it, noting that the hairs thereon were not burned. Defendant was then tested for smoke and accelerants by members of the bomb and arson unit while other officers were dispatched to locate Bokina. At about 8 p.m., after returning from police headquarters with Sanders, Vallandingham advised defendant of his *Miranda* rights, explaining that because he related certain aspects of the crime which were not public knowledge and because his account of his activities on the night of the murder was inconsistent with the statement of a witness who placed him in the vicinity thereof at about 2 a.m., he had become a suspect in their investigation. After inquiring as to "how much time" he could be given for this crime—which, Vallandingham informed him, was not a police consideration—defendant expressed his willingness to talk about Karen's death. He brought defendant a sandwich and a soda, advised him to think about what he wished to say and then left. At about 10 p.m., defendant was readvised of his rights, whereupon he stated that he and Karen had been lovers for the last few months and that when he stopped by the apartment to invite Sanders out to drink, she quietly asked him to come back at about 11 p.m., by which time she expected Sanders to be gone. When he arrived, at about 11:30, she began pressuring him to leave his wife, which he refused to do. An argument ensued during which she pushed him. When he retaliated in kind, she stumbled back-

ward against the kitchen counter, struck her head and fell to the floor. Seeing that she was dead, he panicked, found some flammable liquid, poured it on her, set it afire and then left. He then called Bokina, explained what had occurred and, together, they contrived the alibi he had given earlier. Bokina was then brought into the interview room, whereupon defendant instructed him to "tell him [Vallandingham] what happened," adding, "I already have." About 20 minutes later, after a second conversation with Bokina, the assistant State's Attorney was called and Sanders was released. On cross-examination, Vallandingham reiterated his earlier testimony that Sanders was the initial suspect in this case and that defendant was not struck or otherwise mistreated while at the police station.

Doctor Beamer, an assistant medical examiner who performed the autopsy of Karen's body, testified that although it was partially burned, he noticed at least 15 to 20 bruises, lacerations and abrasions about the head and neck area as well as a few on her extremities. Her left jaw was fractured and her larnyx was crushed, the latter injury resulting from the application of great force. The primary cause of death was nonligature strangulation in association with severe blunt trauma. A chromatography test performed on her clothing disclosed gasoline residue.

Donald Kamradt testified that at about 2 a.m. on the night of the murder, he and his friend, Jim Barone, were sitting on his porch a few blocks from the murder scene when defendant and another person drove by in defendant's car—a fact he noted to Barone. The following afternoon, after a police officer he knew asked him when he last saw defendant, he had a conversation with Karen's brother, who lived nearby, but he did not learn until later that night that she had been murdered. On cross-examination, Kamradt admitted that he had not mentioned to police that Barone was with him when he saw defendant drive past his house.

Assistant State's Attorney Morask testified that in their first conversation shortly after 2 a.m., defendant related the same accidental account of Karen's death as that which he first told Vallandingham, i.e., that when, in the course of their argument, he pushed her, she struck her head on the kitchen counter and fell to the floor, after which he set fire to the body in a panic, left the apartment and then called Bokina to establish an alibi. However, when told that his version was inconsistent with medical evidence and with Bokina's claim that they drove to a gas station to purchase the gasoline used to set the fire, defendant admitted that his first statement was not altogether accurate and agreed to tell the truth. He then stated that, dur-

ing a mutual struggle, he hit Karen at least twice in the face with his fist and then, in an effort to control her, grabbed her around her neck with his arms, holding her in that manner for about 20 seconds. When he released her, she fell to the floor. After checking for signs of life, he moved the body into the bedroom, left the apartment, called Bokina and arranged to meet him in a bar where he told him what had happened. Bokina predicted that the police would not believe that Karen's death was an accident and suggested they set fire to her apartment to conceal the evidence. They purchased a milk carton full of gasoline and, while he waited in the car, Bokina went back to the apartment and set the fire. After they fabricated the false alibi, Bokina went home. Morask further testified that he took notes during defendant's statement—which he summarized in a memorandum—but that defendant refused to repeat his confession in the presence of a court reporter.

Ken Del Valle, Jerome Bokina's attorney, testified that after being arrested for failing to comply with a subpoena to appear as a State's witness, Bokina agreed to testify on the condition that he be released from custody. When he last saw Bokina—at the suppression hearing conducted the previous day—Bokina assured him he would appear at trial, but he did not see nor have any knowledge of his whereabouts thereafter.

On defense, defendant's father, Felix Piscotti, testified that defendant was at home playing cards until about 10:30 on the night of the murder. Shortly thereafter, they took defendant's truck to his automobile body shop, stopped to purchase some milk and then returned home, at about 11:30. Defendant then went upstairs to his own apartment and he did not see him again that night. On cross-examination, Mr. Piscotti stated that he did not tell the police that his son was at home that night because they never asked him.

James Barone testified that at no time while sitting on Donald Kamradt's porch the night of the murder did he see defendant pass by in a car or hear Kamradt remark to that effect. He acknowledged that defendant was his friend and had visited him at home the night before trial.

Testifying in his own behalf, defendant reiterated his pretrial account of his custodial interrogation, mistreatment by the police and eventual submission to their continuous demands that he repeat to the assistant State's Attorney the confession they fabricated and rehearsed with him.

On cross-examination, defendant at first stated that he was not struck in the face nor did the gun with which Riordan hit him leave a

mark thereon; however, when confronted with his pretrial testimony to the contrary, he explained that Riordan hit him once across the jaw, leaving a mark which was concealed by his beard. Although he acknowledged that Bokina was his friend, he denied telling the police that they played cards together on the night of the murder or that they ever fabricated such an alibi. In fact, at no time during questioning by the police did he ever mention Bokina's name nor did he instruct Bokina to tell the truth when he saw him at the police station. He maintained that, initially, the police ordered him to tell the assistant State's Attorney that Karen's death was an accident and that he and Bokina contrived his alibi, but that after receiving the medical examiner's report, they compelled him, by additional beatings and threats, to repudiate that statement and confess that he hit and strangled Karen and that Bokina set the fire. He acknowledged speaking to Bokina in the courtroom the day before the trial, but denied calling him later that night or having any knowledge of his whereabouts subsequent thereto.

Officer Gavin, a member of the bomb and arson unit, testified that the test be performed on defendant to detect smoke or accelerants was negative, as was the test performed on Rick Sanders. Gavin also stated that the test results could be affected considerably if the subject showered and changed clothes prior thereto, which defendant told him he had done.

In rebuttal, Officer Riordan testified, as he did at the suppression hearing, that neither he nor anyone in his presence struck or threatened defendant or otherwise forced him to make either of his statements and that prior to defendant's first statement, Bokina's name had not been mentioned by anyone in their investigation.

Over defendant's objection, John La Monica, a nurse's aid at Mercy Hospital who knew defendant from the neighborhood, testified that he noticed no bruises, blood or swelling on defendant's face or body when he was brought in to the emergency room on April 29, 1983. Finally, Doctor Tulsiak restated his earlier testimony regarding the absence of visible injury to defendant's body and said he knew of no instrument which could be used to beat a person without causing swelling.

OPINION

■ We first consider defendant's contention that the trial court erred in denying his pretrial motion to suppress the inculpatory statements he allegedly made to the police and the assistant State's Attorney. The primary focus of his lengthy argument on this issue is that

the police lacked probable cause to arrest him and that any statements made during his subsequent detention were, therefore, inadmissible fruits of the illegal arrest.

Initially, we note, however, that although defendant filed a pretrial motion to suppress those statements on the ground that they were extracted through physical and mental coercion, he did not file a motion to quash the arrest nor did he otherwise challenge its legality at any time prior to or during the trial court proceedings. While it is true that under the plain error doctrine established by Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), we may, in proper circumstances, review the question of probable cause for arrest despite a defendant's failure to raise the issue at trial (*People v. Garza* (1984), 125 Ill. App. 3d 182, 465 N.E.2d 595), where such failure renders it impossible to determine "what the full evidence might have been had the State been required to justify the arrest" (*People v. Calderon* (1981), 101 Ill. App. 3d 469, 476, 428 N.E.2d 571, 575), the issue will be deemed waived for purposes of review (*In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672; *People v. Hancock* (1983), 113 Ill. App. 3d 564, 447 N.E.2d 994).

■ Here, with the exception of testimony regarding the reasons for the police officers' decision to contact defendant, the evidence presented by the State at the suppression hearing was properly limited to that relating to the issue before the court, *i.e.*, the voluntariness of the statements he thereafter made. Since there was no evidence regarding what additional information the police gathered in the course of their investigation including, for example, the substance of conversations with Sanders, Bokina and others to whom they spoke, it cannot be conclusively determined from the record before us whether they had probable cause to arrest defendant, and we will not engage in speculation thereon. See *People v. Hancock* (1983), 113 Ill. App. 3d 564, 447 N.E.2d 994; *People v. Calderon* (1981), 101 Ill. App. 3d 469, 428 N.E.2d 571.

Conversely, although defendant maintained throughout trial that he made the statements at issue only after repeated threats and beatings by the police, it appears that he has abandoned that claim on appeal, confining his argument—as noted above—to the alleged lack of probable cause for his arrest.

■ Moreover, even assuming—through a liberal reading of his brief—that defendant has not relinquished his contention that the statements were the product of coercion, we note that the test to be applied in determining the voluntariness of a statement is whether it

was "made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed" (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731). This question is one of fact to be made by the trial court after consideration of the totality of circumstances (*People v. Lopez* (1981), 93 Ill. App. 3d 152, 416 N.E.2d 1127), and its decision will not be disturbed unless it is contrary to the manifest weight of the evidence (*People v. Prim* (1972), 53 Ill. 2d 62, 70; *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672).

Here, defendant's allegations of physical and mental abuse were categorically denied by Officers Vallandingham and Riordan, both of whom testified that defendant was not restrained, prevented from using the telephone or otherwise mistreated while at the police station. Defendant's trial argument, that their testimony was self-serving and, thus, untrustworthy ignores the fact that it was corroborated by Assistant State's Attorney Morask who testified that defendant voluntarily made his statements after indicating that he had been treated well by the police, by the trial testimony of John La Monica, the nurse's aid, that he noticed no bruises, blood or swelling when defendant was brought into the hospital and, perhaps most importantly, by Doctor Tulsiak, a disinterested witness who testified that he found no evidence of physical injury or abuse when he examined defendant and that, indeed, defendant denied having been struck. Moreover, defendant's own testimony was replete with inconsistencies concerning when, where and the number of times he was struck, as well as unsubstantiated claims, such as those relating to the two unidentified officers who beat him and the dentist at the county jail who allegedly extracted the two teeth broken when Riordan hit him with his revolver.

At the conclusion of the hearing on the motion to suppress, the trial court stated, "[W]eighing the credibility of the witnesses, I must say there is no question in my mind. The motion is denied." Later, in denying defendant's post-trial motion, the court elaborated on the reasons for its earlier ruling, saying:

> "As far as the motion to suppress the confession is concerned, I don't think it's even close. I've never seen a defendant get on the stand and lie as bad as [defendant]. *** [I]n all my years in the criminal justice system, he's one of the worst liars I've ever seen, and I was very, very much impressed after he stated about how he was beaten and so forth, [by] the doctor who had

absolutely nothing to do with the case \*\*\* for him to come here and testify and refute his lies. So, as far as the confession, it wasn't even close."

In our view, the evidence, as summarized above, clearly supports not only the trial court's ruling, but also the reasons given for making it and thus, we conclude that the statements were properly admitted at trial.

■ Defendant correlatively contends that without his inculpatory statements, the evidence was insufficient to establish his guilt beyond a reasonable doubt. Specifically, he argues that there were no eyewitnesses to the crimes; that the testimony of Donald Kamradt, the only witness who placed him in the vicinity thereof, was contradicted by his companion, James Barone, who denied seeing him drive by or hearing Kamradt remark that he did; that there was no physical evidence linking him to the crimes; and that the omission in Sanders' testimony of the fact that he (defendant) came to the apartment at about 8 p.m. on the night of the murder to invite Sanders to go out refuted the State's own theory of the case, i.e., that he returned there, on Karen's invitation, sometime after Sanders left on his trip.

Initially, we note that in arguing that aside from the testimony concerning his inculpatory statements, the evidence was insufficient to prove him guilty beyond a reasonable doubt, defendant apparently concedes the inverse proposition, i.e., that those statements, together with the other evidence adduced at trial, were sufficient proof of guilt to sustain his conviction. In view thereof, and because we have already determined that the statements were properly admitted, it is therefore unnecessary for us to review the entire record for the purpose of speculating as to whether the verdict would have been different had the statements been excluded.

Moreover, it is fundamental that it is "the jury's responsibility to resolve factual disputes, assess the credibility of the witnesses, and determine the weight and sufficiency of the evidence [citations], and its judgment will not be reversed unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the guilt of defendant remains." *People v. Yates* (1983), 98 Ill. 2d 502, 518-19, 456 N.E.2d 1369, 1377-78, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.

Here, as to the inconsistent testimony of Kamradt and Barone, the jury easily could have concluded simply—as Barone testified— that he did not see defendant drive by or hear Kamradt comment to that effect. They might also have determined that because Barone admitted that he was a friend of defendant and that defendant visited him

the night before trial, his testimony was suspect and thereafter resolved the dispute in Kamradt's favor.

With respect to the lack of physical evidence, we note that although the results of the test to detect smoke or accelerant fumes on defendant's person were negative, the officer who performed the test stated that the results of such tests could be affected considerably if the subject had showered and changed clothes prior thereto, which, he further stated, defendant indicated he had done. Thus, while it is true that the test did not conclusively link defendant to the crimes, neither did it serve, in the light of Officer Gavin's statements on cross-examination, to eliminate him as a suspect.

Similarly, we attach no particular significance to the fact that Sanders did not testify that defendant came to his and Karen's apartment a few hours before he left for Cincinnati, since the record discloses that he was not asked, either on direct or cross-examination, whether he saw defendant that day. Neither do we agree with defendant that "the basis of the State's case was that [he] said that he had been at the apartment earlier and had been invited back" by Karen. The focal points of the State's case were that during the initial interview defendant commented on certain facts relating to the crimes which were not, as yet, public knowledge and that he thereafter confessed that he strangled her, albeit unintentionally. Since defendant admitted that he knew Sanders for at least 1½ years and Karen for six to seven months, and because there was evidence that Karen had been sexually assaulted, the jury may have inferred that defendant stopped by the apartment of his own accord, was admitted entry by Karen and, upon finding that Sanders was not at home, made advances which she resisted and thereafter strangled her.

Finally, we note that in ruling on defendant's post-trial motion, the court stated,

"As far as the court is concerned it [the evidence] was overwhelming. I would have found him guilty in about half a second."

In view of the above, we cannot say that the evidence was so unsatisfactory or improbable as to leave a reasonable doubt of defendant's guilt.

■ Defendant next contends that the prosecutor's questions and comments suggesting that a witness failed to appear at trial because his testimony would have been unfavorable to the defense and that he was responsible for the absence of that witness constituted reversible error.

In this regard, defendant first challenges the State's examination

of Ken Del Valle, Jerome Bokina's attorney, arguing that although the purported purpose of calling him was to explain Bokina's absence, the prosecutor's questions as to whether he knew the relationship between defendant and Bokina and whether Bokina had testified before the grand jury in this case had the "obvious effect" of suggesting that Bokina had previously testified adversely to defendant and that their friendship had "something to do with Bokina's failure to appear" as a witness for the State.

Initially, we note that defense counsel's objections to both those questions were sustained and that upon conclusion of Del Valle's testimony, the court explained to the jurors that its sole purpose was to account for Bokina's absence and admonished them to infer nothing else therefrom. In our view, the trial court's actions were sufficient to eliminate whatever prejudice otherwise might have resulted from the prosecutor's questions.

As to the remainder of Del Valle's testimony, we note that it is not improper for the State to refer to its own failure to locate a witness where such failure is not attributed to the defendant. (*People v. McKinney* (1983), 117 Ill. App. 3d 591, 453 N.E.2d 926.) Here, Del Valle merely testified that he represented Bokina after his arrest for failure to appear as a witness in this case on a previous occasion; that he last saw Bokina the day before trial at which time he advised him to be present in court to testify the following day; and that he had no knowledge of Bokina's whereabouts thereafter. We find nothing therein attributing Bokina's absence to defendant and therefore conclude that Del Valle's testimony was properly admitted to explain the State's inability to produce him.

Defendant further argues, however, that the prosecutor's subsequent cross-examination of him, which included, *inter alia*, several references to Bokina as "your pal" and "your friend," questions regarding Bokina's whereabouts and whether he told Bokina not to appear went far beyond the ostensibly legitimate purpose of explaining Bokina's absence to implying that he was responsible for it because Bokina's testimony would have been unfavorable to him and thus constituted improper comment on his failure to call Bokina as a witness.

While acknowledging that generally, the prosecutor may not comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defense (*People v. Brown* (1984), 122 Ill. App. 3d 452, 461 N.E.2d 71), the State points out that an exception to the general rule allows such comment where the defendant is responsible for injecting the witness' name into the trial (*People v. Hinson* (1979), 70 Ill. App. 3d 880, 388

N.E.2d 899), and argues that since it was defendant who injected Bokina's name into this case through the statements he made to the police and the assistant State's Attorney, the questions as well as certain closing comments based thereon were appropriate.

As stated in *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 123, 390 N.E.2d 1339, 1346, "most of the cases in which it was held proper to comment on defendant's failure to call witnesses involved situations where potential witnesses who would support defendant's theory of the case were injected by defendant or a defense witness on *direct examination*." Quoting *People v. Mays* (1972), 3 Ill. App. 3d 512, 516, 277 N.E.2d 547, 549, the *Olejniczak* court further stated that "when such potential witnesses are elicited from defendant on cross-examination, 'the responsibility for the failure of the defendant to produce such witnesses cannot be assessed against the defendant or [have] the same significance as when the defendant refers to such potential witnesses in an apparent attempt to bolster his defense.' [Citation.] To conclude otherwise would make it too easy for the prosecutor to circumvent the rule against commenting on defendant's failure to produce witnesses." (*People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 123, 390 N.E.2d 1339, 1346-47; *People v. Patterson* (1980), 88 Ill. App. 3d 168, 410 N.E.2d 396.) Most recently, we held that the exception is likewise inapplicable when the existence of potential witnesses is interjected into the case through the State's witnesses. *People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103.

Here, it was the State which first presented evidence, through testimony concerning defendant's statements to authorities, of Bokina's existence and alleged complicity with defendant in these crimes. Since the theory of defense was that defendant was at home with his family when the crimes occurred, Bokina was not a potential alibi witness whose testimony would have bolstered his defense and he therefore had no reason to call him. Thus, it would appear that the prosecutor's cross-examination of defendant as to the whereabouts of its own witness, and in particular, his questions as to whether defendant told Bokina "not to come to court," were improper.

We note, however, that defense counsel did not object on the two occasions the prosecutor asked defendant whether he knew where Bokina was, and thus waived any error in such questioning for purposes of review. Moreover, the trial court sustained counsel's objections to the other questions about which defendant now complains and later instructed the jury to disregard all questions and comments to which objections were sustained, thereby reducing the chance that defendant would be prejudiced therefrom.

■ In any event, the jury had already heard the testimony of Officers Vallandingham and Riordan and Assistant State's Attorney Morask that defendant first told them he was playing cards with Bokina on the night of the murder but later admitted that the alibi was fabricated and stated that Bokina set the fire to conceal the homicide. In view thereof, it is reasonable to assume that even without the objectionable questions and comments, the jury might have drawn a negative inference from Bokina's failure to appear. In the light of the foregoing, we do not believe that the challenged remarks were so prejudicial as to have contributed to defendant's conviction. See *People v. Patterson* (1980), 88 Ill. App. 3d 168, 410 N.E.2d 396; *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339.

Defendant also contends that numerous other instances of prosecutorial misconduct during cross-examination of him and in closing argument deprived him of a fair trial. Asserting that "the record abounds with examples of overzealous misconduct on the part of the prosecutors" and that "their unfair tactics covered almost every conceivable possibility," he argues that they continually asked questions which were sarcastic, rhetorical, argumentative, not based on the evidence and designed to elicit improper incriminating material and that they engaged in improper name-calling and made numerous comments calculated solely to inflame the passions of the jurors. Although defendant concedes that his trial counsel did not object to many of the remarks he now challenges, he maintains that their cumulative effect was "so decidedly prejudicial" as to require reversal of his conviction.

We first consider defendant's argument that the prosecutor's questions as to whether the police had to "beat out" of him the fact that he knew the victim; how tall she was when his arm was around her throat; where he purchased the gasoline used to burn her apartment; whether he shaved the burned hairs off of his arm; whether the police and assistant State's Attorney were "liars"; and whether they "made up Jerry Bokina" were sarcastic, argumentative and exceeded the scope of his direct testimony.

■ As a general rule, cross-examination should be limited to the subject matter inquired into on direct examination; however, that rule is modified to the extent that it is proper during cross-examination to develop all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.) Moreover, it is well settled that the trial court is vested with substantial discretion to determine both the manner and scope of cross-examination (*People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694), and it is only in the case

of a clear abuse thereof resulting in manifest prejudice to defendant that a court of review will interfere (*People v. Williams* (1977), 66 Ill. 2d 478, 487; *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170). The test to be employed in determining whether the comments or arguments constituted prejudicial error is whether they were such a material factor in defendant's conviction that the jury would likely have reached a contrary verdict had they not been made (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68).

Preliminarily, we note that because defense counsel did not object to any of these questions, the trial court was not called upon to exercise its discretion in ruling on their propriety and, if necessary, to take some curative action to eliminate or at least reduce any prejudice resulting therefrom. Thus, absent a finding of plain error affecting defendant's right to a fair trial, any improprieties in these questions must be deemed waived. See *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

With that in mind, we note that although it is ordinarily improper to question a defendant regarding his opinion of the veracity or credibility of other witnesses (*People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011), since defendant testified on direct examination that he was in no way involved in the commission of these crimes and that the police fabricated various statements—ranging from his original alibi to his ultimate confession—and then forced him, by numerous threats and beatings, to repeat them to the assistant State's Attorney the questions as to what the police forced him to say and whether they and Assistant State's Attorney Morask lied in testifying that he was not beaten and that the statements were his own were clearly within the scope of the subject matter inquired into on direct examination of him. Indeed, the entire line of questioning directed to his denials of having made any of the statements attributed to him and the alleged police conspiracy against him was provoked by his direct testimony on those matters; and while the questions relating to the victim's height, the purchase of gasoline and whether he shaved his arms might have been more properly phrased, because they were matters raised in the State's case and generally denied by defendant, we do not believe they rose to the level of reversible error. See *People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011.

As to the prosecutor's references to Bokina as "your pal" and "your friend," we note that defense counsel's objections thereto were promptly sustained by the trial court. In any event, because the jury was aware, through defendant's own testimony and that of his father, that Bokina was his friend, the State's references—though

needlessly sarcastic—cannot be said to have been so prejudicial as to have denied defendant a fair trial.

Defendant also complains that the State improperly asked whether Bokina owned a motorcycle after an objection to the previous question of whether he (defendant) owned one—to which he responded that he did not—was sustained. Although we agree that an attorney may not persist in asking questions to which objections have been sustained (*People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402), in view of defendant's negative response and the fact that the objection was sustained on grounds of relevancy, we do not see how those questions could have contributed to the jury's verdict.

Defendant further asserts, however, that certain comments made in closing argument, together with these questions, operated to deny him a fair trial.

■■ We have often held that a prosecutor is allowed wide latitude in closing argument as long as his comments are based on the evidence of reasonable inferences therefrom. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929; *People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017.) Moreover, as noted earlier, improper remarks do not generally warrant reversal unless they result in substantial prejudice to defendant (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200), *i.e.*, that absent such comments, defendant would likely have been acquitted (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68), and each case must be decided on its own facts (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880). Furthermore, defendant may not assert such prejudice where the comments of which he complains were provoked or invited by the arguments of his counsel (*People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801).

■■ Defendant first objects to the State's references to him as "loverboy," "a bum" and "a liar," arguing that these characterizations were designed solely to prejudice the jury against him. Once again, however, we note that no objection was made to these remarks and thus, any error must be considered waived. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) Moreover, while we do not condone the growing practice among prosecutors of resorting to name-calling in the closing arguments (see, *e.g., People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298), we do not believe that the references in this case were completely unsupported by the evidence, nor do we find them so inflammatory as to constitute plain error.

Defendant also argues that the prosecutor's references to the vic-

tim's and the jurors' rights were improper and prejudicial. Specifically, the prosecutor stated,

"You know, I heard a lot of talk about rights during this case; the rights of Joseph Piscotti. But I did not hear any talk about the rights of Karen Przekwis. What about her right to lead a life free from fear of being preyed upon by people like that? What about her right to marry, to own a home, to have children, to enjoy Christmas with her family? What about those rights? I did not hear anything about those rights.

You have got some rights, too, ladies and gentlemen. I ask that you exercise those rights and find him guilty of these crimes."

Defendant maintains that these remarks improperly emphasized the family and fiance the victim left behind. *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298.

██ As with most of the challenged questions and comments, no objection was made to this portion of the State's argument and thus it is waived for purposes of review. In any event, the entire theory of defense was that defendant was the object of a police "frame" and that during his custodial interrogation he was denied numerous constitutional rights. Indeed, defense counsel questioned the police officers as to whether a suspect has the right to make a telephone call or otherwise communicate with his family and repeatedly argued in his own closing statement that defendant's rights were violated. In the light thereof, we believe that the comments of the prosecutor were fair response to the defense presented.

Defendant's final argument in this regard involves the following portion of the State's closing argument:

"Second of all, about this case *** he is guilty of murder. There is no question about that.

Based on your finding in that regard, it might dawn on you for a moment, you have been sitting in the same courtroom, now, with a murderer, for the past three days.

If it does anything to you; makes you feel a little bit uneasy, this is your chance; you can do something about it. You can see to it that he does not do it again."

It is defendant's position that by this statement, the prosecutor was issuing a "vague warning that if the jury acquitted [defendant] this 'murderer' would soon murder one of them." Waiver aside, we note that "[a] prosecutor may properly comment unfavorably on the defendant and the violence of the crime, when supported by the evidence, and speak of the evil results of crime and the benefits of a

fearless administration of the law." (*People v. Jackson* (1981), 84 Ill. 2d 350, 360, 418 N.E.2d 739, 744.) In view of the nature of the crimes involved in this case, *i.e.*, the brutal beating and strangulation of a young woman and the subsequent arson of an occupied apartment building for the purpose of concealing the murder, we believe that there was no substantial prejudice to defendant.

■■ Our consideration of the entire record leads us to conclude that defendant received a fair trial and, given the nature of the State's proof, that the questions and comments he now challenges, even where improper were not so prejudicial, individually or cumulatively, as to have deprived him of a fair trial.

■■ Defendant's final contention is that the trial court's imposition of consecutive sentences totalling 60 years for the two convictions constituted an abuse of discretion.

The supreme court has repeatedly held—and defendant does not dispute—that the trial court is normally in a better position than a reviewing court to make a reasoned judgment as to the proper sentence to be imposed after consideration of all relevant factors, and that absent an abuse of discretion, its determination will not be altered on review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

He asserts, however, that in this case the trial court did not find, nor does the record establish, that consecutive sentences were necessary for the protection of the public as is required by section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(b)), which provides:

"The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record."

The supreme court recently had occasion to address a near-identical argument in *People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473. Adopting the reasoning of its earlier decision in *People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855 involving the interpretation of a similar sentencing provision, the *Hicks* court held "that the statutory requirement that the court 'shall set forth in the record' the basis for [its] determination that such sentences are 'required to protect the public from further criminal conduct by the defendant' is permissive rather than mandatory" (101 Ill. 2d 366, 374, 462 N.E.2d 473, 477). The court further held that where the defendant does not request a specific finding relative to the protection of the public, nor complain

to the trial court that the basis therefor was not sufficiently articulated, the statutory requirement will be deemed waived. In the instant case, the defendant made no request for a specific finding as to the basis for the sentences nor did he complain that one was not given. Thus, under the holding in *Hicks*, he has waived his right thereto.

▊ Moreover, the comments made by the trial court at the sentencing hearing clearly demonstrate his belief that consecutive sentences were appropriate under section 5—8—4(b). First, he noted that there were two separate crimes committed—the brutal beating and murder of a young girl and the subsequent arson of her apartment. Although defendant maintains that they were "not independently motivated" and thus warrant concurrent terms, the trial court was obviously of a different opinion, observing,

"As far as the aggravated arson is concerned, I would be remiss in my duty *** in 17 years or 18 years on the bench, I have never sentenced an individual to a consecutive sentence. In this case, I'd be remiss if I did not.

Here is a multi-family building. He kills somebody and then comes back and sets the building on fire with all these people in the building, an older type neighborhood.

If the fire wasn't discovered sooner, we would have multiple deaths and he would be getting set to go and have a lethal injection ***. A lot of people would have died because of his acts ***."

In our view, the trial court's emphasis on the facts that after committing a brutal murder, defendant returned to the scene and with total disregard for the lives and safety of the other tenants, set fire to the fully occupied building, evinces its belief that defendant is a danger to the public and that consecutive sentences of long duration were necessary for the public's protection, a determination with which we fully agree.

For the reasons stated, defendant's convictions and sentences for murder and aggravated arson are affirmed.

Affirmed.

MEJDA, P.J., concur.

JUSTICE PINCHAM, specially concurring:

I concur in the affirmance of the defendant's convictions. The majority opinion details the evidence and it need not be here repeated. There was sufficient evidence of the defendant's guilt to sustain the

jury's guilty verdicts. The evidence of the defendant's guilt was the defendant's successive, but increasingly incriminating, oral statements and the testimony of Donald Kamradt. Kamradt's testimony was that at about 2 a.m. on the night of the murder-arson, he and James Barone, while sitting on Kamradt's porch a few blocks from the murder-arson scene, observed the defendant and a passenger drive by in the defendant's car, which Kamradt testified he mentioned to Barone. Kamradt's testimony was denied by Barone.

The record reveals that Assistant State's Attorney Richard Stock conducted an extensive, highly prejudicial cross-examination of the defendant regarding his friend, Jerome Bokina. During this cross-examination, Stock inferred, in the total absence of any evidentiary support, that the defendant was responsible for Bokina's failure to appear as a State's witness. In addition, Stock repeatedly asked the defendant his opinion of the veracity and credibility of the State's witnesses. This was highly improper. (*People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746.) Both Assistant State's Attorneys Stock and Cronson in their opening and rebuttal jury arguments infelicitously called the jury's attention to the deceased's surviving family and fiance. See *People v. Starks* (1983), 116 Ill. App. 3d 384, 389, 451 N.E.2d 1298.

I concur in affirming the judgment of conviction because the able defense attorney neglected to make the appropriate objections to the prosecutorial transgressions of which the defendant complains. In the few instances that the defendant's attorney did object, he either assigned an inappropriate ground for his objection or the trial judge sustained the objection. My concurrence therefore should not be construed as approval of these prosecutorial transgressions, which the law abhors and resoundingly condemns.

The State presented evidence to the jury that the defendant made three varying and progressively inculpating statements, the particulars of which are set forth in the majority opinion. The defendant's first statement was an alibi—that he was with Jerome Bokina in Bokina's home in Midlothian, when the offenses were committed. The defendant's second statement, in essence, was that in a shoving match arising out of a lover's quarrel between Karen and him, Karen fell and struck her head against the kitchen counter, that he panicked when he saw that she was dead, poured flammable liquid on her, set her on fire and left, that he thereafter called his friend, Jerome Bokina, and that they (Bokina and the defendant) fabricated the alibi which he initially gave. In the defendant's third statement he essentially related that during a fight with Karen, he struck her about her

face with his fist, that he grabbed and held her around her neck to restrain her, that upon releasing her, she fell dead to the floor, that he left the apartment, met with Bokina and told him what had happened, that he and Bokina purchased gasoline with which Bokina set the apartment on fire while the defendant waited in the car, and that Bokina and the defendant then fabricated the alibi. The defendant refused to make a court reported statement.

Attorney Ken DeValle, a State's witness, testified that Jerome Bokina was subpoenaed as a State's witness, that because Bokina failed to appear he was arrested, that he represented Bokina and upon Bokina's assurance that he would appear at trial the following day, Bokina was released, that Bokina did not return and that he did not know of Bokina's whereabouts.

The defendant's father, Felix Piscotti, testified as an alibi witness that the defendant was at home when the offenses were committed. On cross-examination, without any objection from defense counsel, the defendant's father was asked:

"Q. You know who Jerry Bokina is, don't you?
A. Yes.
Q. That is a friend of your son's, right?
A. Yes."

The defendant testified in his own behalf. He denied committing the offenses and stated that police officers beat and threatened him in order to elicit statements from him which they told him to make. Without any evidentiary basis for doing so, the prosecutor suggested in his cross-examination of the defendant that the defendant was responsible for Jerome Bokina's absence as a witness, as follows:

"Q. Let us talk about Jerry Bokina for a minute. *Where is he today?*
A. I have no idea, sir.
Q. He is your friend, isn't he?
A. He is an acquaintance of mine, sir.
Q. Is he your friend, Mr. Piscotti?
A. Yes, you can say that.
Q. *Your father said it yesterday. Was he right, or was he wrong?*
A. Yes, he is a friend.
Q. He is your friend, right? You saw him Monday morning, in this courtroom, didn't you?
A. Yes, I did.
Q. *You did not tell him yesterday not to come today, did you?*

MR. McDONNELL: Objection.

THE COURT: Sustained.

MR. STOCK: *Where is he today, Mr. Piscotti?*

A. I have no idea.

MR. McDONNELL: Objection. Asked and answered.

THE COURT: Sustained. He said he did not know.

MR. STOCK: Where does Bokina live?

A. Midlothian.

Q. *You have not called Bokina in the last day or so, have you?*

A. No, sir.

Q. *You saw him Monday morning, in court, though, didn't you?*

A. Yes, sir.

MR. McDONNELL: Objection. This has been gone over.

THE COURT: He said yes. Asked and answered." (Emphasis added.)

Again, in the complete absence of any evidence, the prosecutor in another instance pursued the following improper examination of the defendant:

"Q. Did you go down to Jerry Bokina's house after you killed Karen—

A. No, sir.

Q. —and change your clothes?

A. No, sir.

Q. Did you ever tell the police that?

A. No, sir.

Q. Did you shave the burnt hair off your arm?

A. No, sir.

Q. Didn't you shave the burnt hair off your arm down at Jerry Bokina's, in Midlothian?

A. No, sir.

Q. *You do not know where Jerry Bokina is today, right?*

A. *No, sir.*" (Emphasis added.)

This cross-examination was most inappropriate. The prosecutor lacked any evidentiary basis for suggesting that the defendant was responsible for Bokina's absence from court or that the defendant had shaved the burnt hair from his arm.[1] (*People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298.) The prosecutor compounded this

---

[1] Other instances of the prosecutor's inflammatory cross-examination of the defendant in the total absence of any evidentiary support are set forth in appendix A.

cross-examination error in closing argument by prejudicially urging, "Funny, we never get a chance to hear from his good pal, Bokina. We got to hear from his lawyer, but not Bokina. \*\*\*. Bokina, we never heard from. We wanted to present him to you." See *People v. Puente* (1981), 98 Ill. App. 3d 936, 948, 424 N.E.2d 775.

I am unwilling to conclude that the aforementioned line of inquiry and jury argument did not influence the jury to return guilty verdicts. It was certainly designed to do so, and only the jurors know whether it did nor did not sway them in arriving at their verdicts. Because defense counsel failed to object, however, the defendant cannot now complain. *People v. Jackson* (1981), 84 Ill. 2d 350, 358, 418 N.E.2d 739.

Additionally, Assistant State's Attorney Stock persistently asked the defendant his opinion of the veracity or integrity of the State's witnesses. This was highly improper. (*People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746.) To set forth each instance would unduly lengthen this opinion.[2] A typical example follows:

"Q. Let me ask you this, Mr. Piscotti. Did the Assistant State's Attorney come back into the room and talk to you again?

A. He came back again.

Q. And at that time, didn't he tell you that your story that you had just given him did not make sense, in light of what Bokina told him?

A. He never told me he talked to Bokina.

Q. You never said that. *So, the Assistant State's Attorney got on the witness stand here, under oath, yesterday, and he lied to this jury, didn't he?*

A. I am not saying he lied, sir. I do not know if he talked to Bokina.

Q. Mr. Piscotti, were you sitting right there when the Assistant State's Attorney took that stand and he told this jury that after he talked to Bokina, he came in to you and said your story did not make sense because of what Bokina had been telling the State's Attorney?

A. He never said that to me, sir.

Q. He did not say that on the stand yesterday?

A. He might have said it on the stand, sir, but he did not say it to me, sir.

Q. *If he did say it on the stand, ASA—State's Attorney*

---

[2]Excerpts of the State's cross-examination of the defendant on his opinion of the veracity of the State's witnesses are set forth in appendix B.

*Morask is a liar, too, right?*
A. Yes, sir.
Q. *So, Vallandingham is a liar; and the Assistant State's Attorney is a liar, also, right?*
A. Yes." (Emphasis added.)

Again, I do not conclude that the totality of this improper cross-examination (see appendix B) did not influence the jury. It certainly was designed to do so. But defense counsel's trial technique not to object precludes this belated complaint on appeal. Nor do I conclude that this cross-examination was properly within the scope of the subject matter inquired into during the defendant's direct-examination.

It should be noted further that Assistant State's Attorney Stock's closing argument to the jury cast aspersions against the defendant's attorney. The impropriety of such prosecutorial denunciations is well settled. (*People v. Starks* (1983), 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298; *People v. Clark* (1983), 114 Ill. App. 3d 252, 256, 448 N.E.2d 926; *People v. Brown* (1983), 113 Ill. App. 3d 625, 630, 447 N.E.2d 1011.) Stock argued to the jury:

"[L]adies and gentlemen, Bob McDonnell has been an attorney in this county for a long time. He has walked around these courtrooms for a long time. He has tried lots of cases. And, no matter how good an attorney Mr. McDonnell is—and he is a very good attorney, ladies and gentlemen—*Mr. McDonnell is not a magician; he cannot change facts.* He cannot change the facts in this case. He was stuck with the facts when he was employed by Mr. Piscotti to represent him. He got the facts the same way we got the facts. He is bound by the facts, and he cannot change them. *He can bring Mr. Piscotti in here today, all cleaned up and polished for you folks, with his big beard and his hair cut; and a tie on. He cannot change the appearance of his client to make you people believe that Mr. Piscotti is not the bum that he really is.*
* * *
So, what does Bob McDonnell have to do in representation of his client? He is stuck with the facts; he cannot change the facts. He can polish up the client, and bring him in. That is not enough. He['s] got to come up with some kind of defense." (Emphasis added.)

This argument undoubtedly influenced the jury. Such an improper argument is not to be judicially condoned. Defense counsel elected to condone it, however, when he did not object to it.

Finally, the prosecuting attorneys in their opening and closing arguments to the jury improperly emphasized the victim's family. (*People v. Bernette* (1964), 30 Ill. 2d 359, 371, 197 N.E.2d 436; *People v. Starks* (1983), 116 Ill. App. 3d 384, 389-90, 451 N.E.2d 1298; *People v. Hyde* (1971), 1 Ill. App. 3d 831, 840, 275 N.E.2d 239.) The prosecutors prejudicially issued a warning to the jury that if acquitted, the defendant might murder one of them. Assistant State's Attorney Cronson stated:

"First of all, about Piscotti; he is a liar. Second of all, about this case; that is, that he is guilty of the Murder. There is no question about that. Based on your finding in that regard, it might dawn on you for a moment, you have been sitting in the same courtroom, now, with a murderer, for the past three days. If it does anything to you, makes you feel a little bit uneasy, this is your chance; you can do something about it. You can see to it he does not do it again. You have that opportunity, ladies and gentlemen. You are what stands between him and me and us, and all of us. ***.

You know, I heard a lot of talk about rights during this case; the rights of Joseph Piscotti. But I did not hear any talk about the rights of Karen Przekwis. What about her right to lead a life free of fear from being preyed upon by people like that? *What about her right to marry, to own a home, to have children, to enjoy Christmas with her family? What about those rights?* I did not hear anything about those rights.

You have got some rights, too, ladies and gentlemen. I ask that you exercise those rights, and you find him guilty of these crimes." (Emphasis added.)

Assistant State's Attorney Stock similarly argued in closing:

"Karen Przekwis is dead. I would like nothing better than to bring her in and let her tell *** how she did not get her rights.

\* \* \*

We heard about his rights; his right to a phone call, his right to call his father. He got his rights. He got his sandwich; he got his pop; he got his rights. He got his Miranda Rights. What rights did Karen get? Did Karen get a sandwich before he choked her to death? Did Karen get a sandwich before he beat her to death? Did Karen get her Miranda Rights before he smashed her throat? Did she get her rights before he threw gas on her, and torched the entire apartment?"

It is quite apparent that these inflammatory arguments served their purpose of persuading the jury to find the defendant guilty. Nei-

ther argument, in my judgment, was invited or was an appropriate response to defense counsel's argument. But again, no objections were made.

The above-mentioned prosecutorial tactics came perilously close to irreparably tarnishing the jury's verdicts and unquestionably would have done so had defense counsel appropriately objected to them. Having made the trial strategy decision not to object, the defendant is bound by it.

I do not conclude that the hideous nature of the crimes—the beating and strangulation of the deceased and the arson of the premises in which other tenants were present—validated the prosecutor's inflammatory jury arguments. But for the reasons stated, I concur in the affirmance of the defendant's convictions and sentences.

APPENDIX A

Excerpts of Assistant State's Attorney Stock's cross-examination of the defendant without any evidentiary basis.

"Q. When she [Karen Przekwis] had her back to you, and your arm was around her neck, how tall was she then?

A. I have no idea. That was not me, sir.

Q. Would five-eight sound about right?

A. I am not sure, sir.

\* \* \*

Q. You had a beard then, right?

A. Yes.

Q. When did you shave off your beard? Was it for the jury?

MR. McDONNELL: Objection.

THE WITNESS: No, sir. I shaved—

THE COURT: The answer is no.

THE WITNESS: —I saved [sic] it off.

MR. STOCK: Before this trial started?

A. I shaved it off when I was in the County, when I was under custody.

\* \* \*

Q. You got a motorcycle, Mr. Piscotti—

MR. McDONNELL: Objection.

THE WITNESS: No, sir.

THE COURT: Sustained. Irrelevant.

MR. STOCK: Bokina got a motorcycle?

MR. McDONNELL: Objection. I would ask to be heard, now, Judge.

THE COURT: Sustained. It is irrelevant.

Mr. McDONNELL: Counsel keeps asking the same type of questions. Apparently, he does not believe in your Honor's ruling.

\* \* \*

Q. Let me show you what has been marked People's Exhibit Seven, for identification.

Is that a picture of Karen?

A. I do not know who that is, sir.

MR. McDONNELL: Objection.

MR. STOCK: You do not know who that is?

A. No, sir.

Mr. McDONNELL: Objection. I have a motion.

THE COURT: He does not know who it is.

MR. McDONNELL: I have a motion, your Honor.

MR. STOCK: Is that the way she looked when you left the apartment? Is that the way she looked when you left the apartment?

A. I was never in the apartment."

APPENDIX B

Excerpts of Assistant State's Attorney Stock's cross-examination of the defendant as to his opinion of the veracity of the State's witnesses.

Q. And you told them how Rick Sanders and Karen Przekwis used to fight all the time, didn't you?

A. I did not say that.

Q. *So, the cops were making that up?*

A. I did not say they fought all the time.

Q. Did you ever tell the police that Rick Sanders once grabbed Karen Przekwis by the throat?

A. No, I did not.

Q. *So, the police are imagining that, right?*

A. Yes, sir.

\* \* \*

Q. Some time that evening, [of the defendant's arrest] you had the opportunity to talk to your friend, Jerry Bokina, didn't you?

A. What evening is this, sir?

Q. While you were in the police station.

A. No, sir.

Q. You never talked to Jerry Bokina?

A. No, sir.

Q. *So, the cops are lying about that, too, right?*

A. I never talked to Jerry Bokina in the police station.

\* \* \*

THE COURT: This is Cross, Counsel.

MR. STOCK: Mr. Piscotti, did you see Bokina in the police station?

A. I seen him in the police station, yes, I did.

Q. Did they bring him into the room with you?

A. Yes.

Q. Did you talk to Bokina in the police station.

A. No, I did not.

Q. *So, when the police officers say that you told Bokina to forget about the alibi and tell them what happened, they have to be lying, don't they?*

A. Yes, they are.

\* \* \*

Q. Now, did you ever tell the police that you were with Bokina, playing cards, that night?

A. No, sir.

Q. Did you ever tell the police that you were with your parents, playing cards, that night?

A. Yes, sir.

Q. *So, the police made up Bokina?*

A. Jerry Bokina?

Q. Did you understand my question, Mr. Piscotti? *Did the police make up Bokina?*

MR. McDONNELL: It is an impossible question to answer.

THE COURT: Sustained.

MR. STOCK: *Did the police make it up, your statement that you were with Bokina, playing cards?*

A. Yes, they did.

\* \* \*

Q. Did you tell the police at that time that after you had strangled Karen, you called Jerry Bokina, and told him to come and pick you up?

A. I never said that, sir. I never called him.

Q. *Well—So then, when the Assistant State's Attorney said that was your second story, he is lying again right?*

A. Yes, sir.

\* \* \*

Q. Did you tell the State's Attorney that you were with Bokina after the fire was set, or during—while the fire was set?

A. This is what the police told me to say.

Q. Did you say that to the State's Attorney?

A. Yes.

Q. *So, when he got on the stand and said that he did not lie, did he?*

A. He lied, sir, because I never said that willingly.

\* \* \*

Q. Did you, or didn't you, tell the Assistant State's Attorney, in the first conversation, the one you screwed up, the first conversation with the Assistant State's Attorney, that after you killed Karen Przekwis, you found some flammable liquid in the apartment, and poured it on her body, and set her on fire, and then you ran away and called Bokina? Did you, or didn't you, say that to the State's Attorney?

A. No, sir.

Q. *So, when he got up there and said that, he lied, right?*

A. Yes, sir.

\* \* \*

Q. Did the Assistant State's Attorney tell you to say where you bought the gas?

A. No, sir. They never mentioned nothing about the gas.

Q. Nothing about gas?

A. Not to me, sir.

Q. *So, the police made up the gas, right?*

A. I do not know if they made it up, sir.

Q. Well, you heard the Assistant State's Attorney testified that you told him you bought the gas at a gas station on Damen.

A. No, sir.

\* \* \*

Q. I am talking about on the stand yesterday. You were sitting right there, weren't you?

A. I heard him say that.

Q. *That was a lie, too? Was that a lie, or did the police beat that part out of you, too?*

A. I never said that, sir.

Q. Okay. *So then, that was an outright lie?*

A. Yes, sir." (Emphasis added.)