THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KING GEORGE FRISBY, JR., Defendant-Appellant.

First District (3rd Division) No. 85—0721

Opinion filed August 19, 1987.

24

Chadwell & Kayser, Ltd., and Steven Clark, of State Appellate Defender's Office, both of Chicago (Marsha K. Hoover, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Timothy W. Heath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant King George Frisby, Jr., was charged by indictment with home invasion (Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a)(2)) and residential burglary (Ill. Rev. Stat. 1983, ch. 38, par. 19—3). After a jury trial during which defendant represented himself, he was convicted of home invasion and acquitted of residential burglary. After trial, the trial judge denied defendant's motion for a new trial and sentenced him to 30 years in the Illinois Department of Corrections for the home invasion conviction.

Defendant appeals and raises the following contentions: (1) the State failed to prove defendant's guilt beyond a reasonable doubt since it failed to establish two elements of the home invasion offense, namely, that defendant knowingly entered a dwelling and that defendant knew or had reason to know that one or more persons were present in the building; (2) the State failed to prove defendant guilty beyond a reasonable doubt where the in-court identifications of defendant were unconstitutionally unreliable and tainted by a suggestive custodial "show-up," and where the identifying witnesses failed to give police a physical description of defendant prior to the alleged "show-up"; (3) defendant was denied a fair trial where the prosecutor, during opening and closing statements to the jury, impermissibly commented on defendant's failure to testify, misstated the facts and law, and personally vouched for the credibility of a witness, and where the

trial court erred in failing to exercise its discretion to consider the jury's request to read the testimony of a trial witness; (4) the trial court abused its discretion in imposing a sentence of 30 years' imprisonment in light of defendant's potential for rehabilitation and the nature of the offense; and (5) the circuit court of Cook County did not have jurisdiction to punish defendant for the commission of a felony.

For the reasons stated below, the decision of the circuit court of Cook County is affirmed.

At trial several eyewitnesses testified for the State, including Diane Fowler, Cheryl Caruth, Lamont Simpson, and two Chicago police officers. Defendant also called Fowler and Caruth, in addition to calling several other witnesses to testify on his behalf. The trial testimony revealed the following facts.

On August 10, 1984, at about 4 a.m., Diane Fowler, Cheryl Caruth, Charles Simpson, and Sherry Holmes were outside on the back porch of the second floor of a house located at 4323 South Wells in Chicago. The porch faced the front of another building located at the same address. Fowler lived with her mother in the front house. Caruth lived in the rear cottage with her boyfriend, Lamont Simpson. Caruth and Lamont Simpson had been living in the back building since some time in June 1984. Fowler's mother owned the rear structure.

Fowler testified that some rehabilitation work was begun on the rear building in May. For about a year prior to the time when Caruth and Lamont Simpson moved in, the cottage had been abandoned. At the time of the subject incident, the rear windows were boarded over and the front, second-floor door was nailed shut. Caruth testified that access to the structure was possible through the front and rear doors leading to the basement.

Shortly before 4 a.m. on August 10, Caruth left the others on the back porch and went into the rear building. She went to the bedroom, removed her clothes, turned on a radio, and lay down in bed next to Lamont Simpson, who was sleeping.

Meanwhile, from the back porch Fowler observed two men walk from the direction of the alley behind the rear structure through the gangway to the front of the rear structure. She saw them try to open the basement door, but the door did not open. Then they climbed the stairs at the front of the cottage and tried to open the door at the top of the stairs. The door had been nailed shut, and the men were not able to open it. They looked into the living room window next to the second-floor door. The bedroom in which Caruth and Lamont Simpson were lying and in which the radio was playing is on the same floor as

the living room.

The two men then went back downstairs and walked toward the alley. Fowler saw that the first man down the stairs held what appeared to be a gun in his hand. Holmes heard a banging noise coming from the back of the cottage. She then went inside the front house and called the police. Fowler remained on the porch.

Caruth heard noises at the back of the building and therefore awakened Lamont Simpson. Meanwhile, a light in the basement of the rear building went off. Two individuals climbed the interior stairs of the building shouting, "Freeze, it's the police." Lamont Simpson jumped out of bed and went to the doorway of the room. When the men reached the top of the stairs, Lamont Simpson saw that they were holding guns. Lamont backed inside the bedroom doorway and stooped down. The two men approached the bedroom, and one, asserted by Caruth to be defendant, announced a stickup. The men told Lamont Simpson to come out of the room. The second intruder (not asserted to be defendant) struck Lamont Simpson on the head and knocked him to the floor. The two men hit Simpson again, kicked him in the head, and forced him to lie face down on the floor outside the bedroom.

The intruder alleged by Caruth to be defendant stood in the bedroom doorway. He asked Caruth if she was pregnant. Caruth replied that she was. He turned to the other intruder and told him, "The bitch is pregnant." The intruders refused to let Caruth or Lamont Simpson put on any clothes. There was no light on inside the bedroom; however, a streetlight in the alley behind the cottage provided some light in the room. Police officer Karpil testified at trial that the alley light was about three houses down from the cottage and did provide light to the area.

When the intruder alleged to be defendant then turned away momentarily, Caruth stooped down to pick up a sheet to cover herself. She also picked up a glass mug from beside the bed. The intruder asked Caruth what she had in her hand, and ordered her to put down the object. Caruth testified that, with the mug in her hand, she came within an arm's reach of the intruder she identified as defendant. Around this time, Caruth and Lamont Simpson saw a light shine up through the window. Caruth identified the light as a police light. After she saw the light, Caruth went to the window and shouted that there were two men inside with guns attempting to hold her up.

The unidentified intruder ran and dove through a closed window in the living room. The intruder identified as defendant ran and also tried to dive through the same window. Before he could get through

the window, however, Simpson hit him with a stick at least twice around the head and shoulders. The second intruder eventually jumped through the window.

Meanwhile, Fowler was still on the back porch of the front house. She heard a crashing sound and saw first one person and then another jump through the window of the rear building. Fowler testified that the second person had difficulty jumping through the window as he was struggling with someone inside the cottage. After leaving the cottage, the two intruders ran past the back porch where Fowler was sitting to the gangway which lies alongside both the front and rear buildings and stretches from the street to the alley. Fowler lost sight of the intruders as they ran through the gangway toward the front of the house.

By this time, Chicago police officers Karpil, McMahon, Sarabia, and Castanada had arrived on the scene. Officers Karpil and McMahon positioned their car in the alley behind the rear building. Officers Sarabia and Castanada stationed their car on the street at the gangway in front of the front house. Karpil walked with his flashlight to the gangway and began walking through the gangway toward the street. The gangway itself was not lighted, but Karpil testified that from his position at the alley end of the gangway, there was enough light that he could see Sarabia and his car parked at the street end of the gangway. Sarabia stood on the street side of his car, looking over the hood, directly down the gangway. Sarabia testified that from this position, there was enough light that he was able to see Karpil.

Karpil and Sarabia then heard someone yell, "It's bona fide, he has got a gun." Then they heard a crashing sound. Karpil testified that it was the sound of glass breaking. Sarabia saw two black males running in the gangway toward the street, one following the other. The second person appeared to be carrying a gun. Karpil began chasing the men. Sarabia drew his gun and ordered the men to stop. Sarabia did not fire when the men ignored his command, because he could see police officers behind the pair. Sarabia again ordered the men to stop. He also ordered the second man to drop the gun he was carrying. The individual in front, the defendant, then obeyed and lay on the ground. The second man leapt over defendant, continued to run, and never was apprehended. Sarabia fired three shots at the second man as he fled. The fleeing assailant dropped his gun, a plastic pistol, which later was recovered.

Defendant then was handcuffed. Fowler, Caruth, and Lamont Simpson came to the front of the house where defendant was being held by police. Fowler and Caruth identified defendant as one of the

intruders. Lamont Simpson was unable to identify defendant. At the time of his arrest, defendant had a cut over his left eyebrow. Type B human blood, which is defendant's blood type, was found on his tee shirt. Later, there was human blood found on some of the glass fragments found on the sill of the broken window and the stairs of the cottage.

Defendant was taken to the police station and searched there. An open package of nuts which contained one or two pieces of glass was found in defendant's shirt pocket. Defendant was asked to comb his hair. Glass fragments were found in the hair from his head. Chicago police department microanalyst Ray Lenz analyzed the comb, hair, and glass fragments found on defendant as well as the glass from the broken window. Lenz, who testified at trial as the State's expert, concluded that there was a great probability that the glass from defendant's hair and the glass from the broken window could have come from the same pane.

Photographs of the rear cottage and portions of the areas surrounding the cottage were introduced at trial by both defendant and the State.

I

On appeal defendant initially contends that the State failed to prove his guilt beyond a reasonable doubt since the State failed to establish two elements of the offense of home invasion, namely: (A) that defendant knowingly entered a dwelling, and (B) that defendant knew or had reason to know that one or more persons were present in the building.

A

■■ First, defendant asserts that the State failed to prove that he was consciously aware that the building he entered was a dwelling. Defendant states that the rear cottage appeared abandoned in that some windows on the basement level were boarded; the front, second-floor door was nailed shut; and the electric meter, located on the side of the building in such a position that it would have been visible to defendant, was broken, indicating that there was no electricity being supplied to the house.

Defendant also argues that the "reputation" of the structure during recent months prior to the occurrence is relevant to the issue of defendant's knowledge. At trial defendant called his own witnesses to establish that during some months prior to the occurrence, the building appeared to be abandoned. Defendant notes on appeal that in the

home invasion statute (Ill. Rev. Stat. 1983, ch. 38, par. 12—11), the legislature specifically proscribed knowing entry into a "dwelling," rather than the more general "structure" or "building."

The State responds that the evidence showed that the building was a "dwelling" within the meaning of the statute (Ill. Rev. Stat. 1983, ch. 38, par. 2—6), in that it was used and intended to be used as a home and residence. Specifically, all of the witnesses at trial described the building as a house, and Caruth and Lamont Simpson had been living there since June 1984. The purpose for which a structure is used, rather than the nature of the structure, determines whether it is a "dwelling place." *People v. Bales* (1985), 108 Ill. 2d 182.

Further, the State asserts that the evidence shows that defendant had reason to know that the building was a dwelling place of another. The witnesses at trial described the building as a house. Further, the building had doors and glass windows on the second floor in place and secured. Defendant's own witnesses even testified that the house had undergone renovation during the months prior to the occurrence. In addition, Caruth had turned on a radio in the bedroom that night. The bedroom and the living room were on the same floor, and one room opened up into the other. As defendant peered into the living room window, the State argues, it was likely that he could have heard the radio.

Additionally, there was a light on in the basement before and just after the intruders entered the building. The intruders allegedly entered the building through a hole in the basement wall which had been boarded up. Therefore, the State asserts, the light in the basement would have been visible to defendant no later than when he and the other man allegedly removed the board from the outside wall.

■ We find that the knowledge requirement has been met. The evidence and the reasonable inferences to be drawn therefrom support a finding beyond a reasonable doubt that defendant had reason to know that the building was the dwelling place of another. (*People v. Bales* (1985), 108 Ill. 2d 182.) While it is possible or probable that defendant and his cohort were not able to hear the radio playing while they stood outside the building, nevertheless, the remaining contentions of the State regarding the apparent purpose of the building, its appearance, and the conduct of the intruders adequately support the jury's finding.

B

■ With regard to the second element, defendant asserts that the evidence fails to indicate a substantial probability that defendant

knew or had reason to know that one or more persons were present in the building. Defendant asserts that the evidence of the actual presence of Caruth and Simpson, without more, is insufficient to prove defendant's knowledge of their presence. Defendant notes the State's failure to present evidence to indicate, for example, that lights were on which were visible from the outside, that there were any cars in the driveway or around the house, or that there were any voices or other noise which could be heard coming from the house. Further, there was no evidence to indicate that the radio could be heard at any range beyond Caruth's earshot.

Defendant relies on three cases regarding the alleged insufficiency of evidence. In *People v. Austin* (1984), 123 Ill. App. 3d 788, 463 N.E.2d 444, the knowledge requirement was met where the evidence showed that 13 men were playing cards inside the building, there were lights on, and there was noise coming from the building. Further, upon entering the building, the defendant in *Austin* kicked open the door and immediately started to shoot a gun. The court found that such conduct indicated that the defendant was aware of the presence of people inside. 123 Ill. App. 3d 788, 795, 463 N.E.2d 444, 450.

In *People v. Davis* (1982), 106 Ill. App. 3d 260, 435 N.E.2d 838, the court held that a building which was a residence and was "obviously kept up" gave notice to the defendant that there might be an occupant inside. (106 Ill. App. 3d 260, 267, 435 N.E.2d 838, 844.) Also, in *People v. Howard* (1985), 130 Ill. App. 3d 967, 474 N.E.2d 1345, the knowledge requirement was met where the defendant entered a house which he knew to be the home of his brother. The defendant in *Howard* entered the building at around 2 a.m., a time when he knew that his brother's wife was most likely asleep and when his brother's children were likely to be at home. 130 Ill. App. 3d 967, 979, 474 N.E.2d 1345, 1354.

Additionally, defendant asserts that the conduct of the intruders after they entered the building fails to establish their knowledge prior to entry. The intruders' conduct in gaining entry obviously was not stealthy, as both Fowler and Caruth heard the noise of their apparent entry coming from the lower rear portion of the rear building. *People v. Austin* (1984), 123 Ill. App. 3d 788, 463 N.E.2d 444.

The State responds that the knowledge requirement for the second element was sufficiently established. We agree. The time of defendant's invasion is significant in upholding a conviction for home invasion. (*People v. Davis* (1984), 124 Ill. App. 3d 813, 821-22, 464 N.E.2d 1150, 1156.) Defendant entered the building at around 4 a.m., a time when it could be expected that someone would be home. Fur-

ther, new doors had been added and windows replaced in the cottage during the month prior to the occurrence, which indicates that the building was a residence and was being kept up. (*People v. Davis* (1982), 106 Ill. App. 3d 260, 435 N.E.2d 838.) Also, there was a light on in the room which the intruder first entered, and a radio was on in the building. These factors would give notice to intruders that someone might be inside. 106 Ill. App. 3d 260, 267, 435 N.E.2d 838, 844.

■■ We also agree with the State's contention that the conduct of the intruders further indicates that they had reason to know someone was in the building. First, the intruders apparently turned off the basement light after they entered the building, which shows that they were concerned about people inside seeing them. Second, the intruders quickly ran up the stairs shouting, "Freeze, police," which conduct suggests that they knew someone was inside the building.

Both the State and defendant cite *People v. Austin* (1984), 123 Ill. App. 3d 788, 463 N.E.2d 444. In *Austin*, the defendant approached the building, kicked open the door, and immediately began shooting. (123 Ill. App. 3d 788, 794, 463 N.E.2d 444, 450.) Although the facts in the instant case do not indicate such blatant conduct, nevertheless, the evidence regarding defendant's conduct after he entered the building is sufficient to support a reasonable inference that he knew that there were persons present.

■■ The State also properly refutes defendant's contention that the building was abandoned. The witnesses who testified regarding the condition and appearance of the building were defendant's own witnesses, each of whom failed to see the cottage for several months prior to the occurrence. When shown photographs depicting the cottage as it appeared at or around the time of the occurrence, those witnesses testified that improvements had been made since the time they had last seen the building. The State has met its burden of establishing that defendant had reason to know there were persons present in the building.

II

■■ ■ Defendant next contends that the State failed to establish his guilt beyond a reasonable doubt where the in-court identifications of defendant were unconstitutionally unreliable. Defendant asserts that his right to due process of law was violated in that: (1) the eyewitnesses to the incident had insufficient opportunity to observe the offenders; (2) the in-court identifications of defendant were tainted by a custodial "show-up"; and (3) Fowler and Caruth, both of whom identified defendant, failed to provide the police with a physical descrip-

tion of the offenders prior to the "show-up."

Defendant asserts that he was subjected to a one-man "show-up" after he was handcuffed and in police custody, at the time when Caruth and Fowler were asked to identify him. Defendant notes that such an identification procedure has been "widely condemned" because of its suggestive nature. *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.

Defendant further asserts that the evidence in the instant case lacks the necessary indicia of reliability required under the "totality of the circumstances" test for an identification procedure. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.) The factors to be considered under the test set forth in *Neil* and adopted by the Illinois Supreme Court in *People v. Manion* (1977), 67 Ill. 2d 564, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513, are the following: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; *People v. Manion* (1977), 67 Ill. 2d 564, 571.

Defendant asserts that an application of those five factors to the instant case indicates a violation of due process of law. First, he asserts, neither Caruth nor Fowler had a sufficient opportunity to observe the intruders. Lamont Simpson testified that the bedroom was dark. There were no lights on inside the building, and the alley light was three houses away from the building. The fact that the intruder did not or could not identify the object (a mug) that Caruth picked up while she and the intruder were in the bedroom indicates that there was only enough light for the intruder to observe Caruth move, but not enough to see a mug in her hand.

Further, contrary to the State's assertion, there was no evidence of a spotlight being shined on the building by the police. Even if the presence of police cars added some illumination to the room, any light provided was not a steady stream. Further, Caruth's view of the intruder was of a very short duration, because as soon as the police arrived, the intruders fled to the living room. Finally with regard to Caruth's identification, defendant asserts that after he was in police custody, Caruth failed to give an accurate description, as she could not tell whether defendant had a part in his hair and mistakenly thought he was wearing a karate jacket.

Defendant also asserts that there was not sufficient light for

Fowler to see defendant. He asserts that Fowler could not have seen the intruders clearly, since the intruders themselves were apparently unaware of the three persons on the porch. Defendant also attempts to assert that Fowler's observation was interrupted when she dove to the porch at the crashing sound of the first offender coming through the glass. Finally, Fowler failed to give police a description of defendant prior to the time defendant was placed in custody.

Defendant maintains that the identification of defendant by both Fowler and Caruth was speculative. Since an "inherently suggestive" pretrial identification procedure was used, the State failed to meet its burden of producing clear and convincing evidence that the in-court identification of defendant had an independent source. *People v. Wright* (1970), 126 Ill. App. 2d 91, 95, 261 N.E.2d 445, 448.

The State initially responds that defendant's failure to raise at trial the suggestivity of the pretrial identifications precludes him from raising the issue on appeal. As a result of defendant's failure to object at trial, the circumstances of the "show-up" are not fully developed in the record.

■ We agree that defendant should have raised this issue at trial in order to preserve the issue for appeal. Even assuming, however, that defendant has not waived the issue on appeal, we still find that the evidence in the record supports a reasonable inference that the witnesses had a sufficient opportunity to observe defendant before he was in police custody. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *People v. Manion* (1977), 67 Ill. 2d 564.) The requirement of proving an independent source of identification has been met, and the use of a "show-up" procedure was justified. *People v. Wright* (1970), 126 Ill. App. 2d 91, 261 N.E.2d 445; *People v. Hahn* (1976), 39 Ill. App. 3d 969, 350 N.E.2d 839.

First, the evidence shows that Caruth had an adequate opportunity to see defendant while they were in the bedroom. Caruth testified that she was standing near defendant in the bedroom, had a conversation with him, and at one point, came within arm's reach of him. Her attention was sharply focused on defendant. She watched him kick Lamont Simpson, and she was concerned that he had a gun in his hand. These circumstances indicate that Caruth's degree of attentiveness was probably very high. She was obviously not merely a casual observer during these events. *People v. Brown* (1982), 110 Ill. App. 3d 1125, 443 N.E.2d 665.

Additionally, although there was no light on inside the bedroom, the evidence indicates that the illumination provided by the alley light and the police lights was adequate for Caruth and Fowler to make a

sufficiently reliable identification of defendant. While the alley light was three houses down from the cottage where the incident occurred, Caruth testified that it provided at least some light in the room. Additionally, Officer Karpil testified that the alley light illuminated the area surrounding the cottage. The flashlight which Karpil was carrying and the lights which apparently shined from the police cars gave additional light.

Defendant argues that Lamont Simpson failed to identify him. However, both Fowler and Caruth identified defendant immediately after arriving at the area where he was being held by police. Defendant notes that Caruth mistakenly thought that defendant had on a karate jacket. Caruth, however, did recall that defendant was dressed all in black. Defendant also points out that Caruth could not recall whether defendant had a part in his hair. That factor alone does not diminish Caruth's credibility. This court has previously recognized that an identification is not made by distinguishing separate features but by the total impression made upon the witness. (*People v. Lindsey* (1979), 72 Ill. App. 3d 764, 391 N.E.2d 382.) Therefore, omissions in the preliminary descriptions, where the witness had an adequate opportunity to observe the offender, do not necessarily affect the credibility of a witness' identification. 72 Ill. App. 3d 764, 391 N.E.2d 382; *People v. Taylor* (1981), 99 Ill. App. 3d 15, 424 N.E.2d 1246.

Defendant's assertion that Fowler's observation of defendant was interrupted by her diving to the floor of the porch when she heard the sound of glass crashing is not well supported by the facts. Rather, the record supports the conclusion that it was after Fowler heard gunshots that she fell to the base of the porch. Therefore, she would have had a sufficient opportunity to observe defendant as he jumped through the window and began to run through the gangway. Also, defendant infers that it was unlikely that Fowler had been closely observing the intruders, when they apparently had been unaware of her presence on the porch as they ran through the gangway after the incident. The record indicates, however, that the porch where Fowler was sitting was on the second floor of the building. Defendant and the other man were running, with their attention apparently focused directly in front of them, through the gangway below. They would not necessarily have had a good opportunity to observe Fowler.

### III

Defendant also contends that he was denied a fair trial as a result of impermissible conduct by the prosecutor and court. Specifically,

defendant asserts: (A) the prosecutor commented during closing argument concerning defendant's failure to testify, thereby violating defendant's rights under the fifth and fourteenth amendments to the Constitution; (B) the prosecutor's opening and closing arguments contained mischaracterizations of the evidence and law and an impermissible expression of the prosecutor's belief in the credibility of Cheryl Caruth's testimony; and (C) the trial court erred in failing to exercise its discretion to consider the jury's request to read the testimony of Caruth.

### A

First, defendant points to the following language from the prosecutor's closing arguments:

"MR. KAISER [State's Attorney]:

\* \* \*

Now, the defendant, in his opening statement, said he was never in the building. Well, the question then is he one of the people who was in the building. The only evidence you heard *from the witness stand* on that question was that the defendant was one of the people who was in that building." (Emphasis added.)

Defendant asserts that the prosecutor's comments attempted to stress to the jury the fact that defendant did not testify at trial and therefore violated his due process rights. (*United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1300; *People v. Ray* (1984), 126 Ill. App. 3d 656, 661, 467 N.E.2d 1078, 1082.) Further, defendant asserts, the prosecutor's remarks mandate a new trial, as they likely caused defendant to suffer harm. *People v. Chellew* (1968), 104 Ill. App. 2d 100, 104, 243 N.E.2d 49, 53-54.

We find that defendant's argument must fail, as the prosecutor's language falls far short of a constitutional violation. (*People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078.) *People v. Chellew* (1968), 104 Ill. App. 2d 100, 243 N.E.2d 49, is distinguishable from the instant case since in *Chellew*, the comments of the prosecutor which mandated reversal were explicit statements that he had not heard the defendants testify. (104 Ill. App. 2d 100, 107, 243 N.E.2d 49, 53.) There is no such explicit language in the instant case, and defendant's inference is strained, based on a reading of the comments in their context.

### B

Second, defendant contends that the prosecutor made im-

proper remarks and mischaracterized the evidence and law during opening and closing arguments. The prosecutor's erroneous factual assertions allegedly confused the jury and prejudiced defendant. Defendant relies on *People v. Rogers* (1976), 42 Ill. App. 3d 499, 356 N.E.2d 413, and *People v. Weller* (1970), 123 Ill. App. 2d 421, 258 N.E.2d 806, to assert that the prosecutor's comments constituted error which deprived defendant of a fair trial and warrant reversal of his conviction.

First, defendant asserts that, in both his opening and closing statements, the prosecutor referred to a "spotlight" that the police allegedly shined on the house. The evidence at trial failed to show that a spotlight was ever used.

The State responds that Caruth and Simpson both testified that they saw a light shine through the window of the cottage. It was at this time that Caruth yelled out the window to police, and then the intruders attempted to escape through the living room window. The police officers testified that at that time, they were positioned outside the house and had begun to search the area. The "combination" of testimony from the police officers, along with that of Caruth and Simpson, the State argues, establishes the factual basis for the prosecutor's remarks in his opening statement and the comments therefore were proper. *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363; *People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017.

The State contends that the prosecutor's reference to the spotlight in his *closing* argument was also proper because it was based on the evidence. The State asserts that the statement in closing argument was an attempt to refute defendant's contention that the light in the cottage was insufficient for Caruth to identify defendant. The remark was based on the evidence that there was a streetlight in the alley and that at some point prior to the time that the intruders escaped through the window, some additional light shined through the window. *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363; *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.

The State further asserts that even if the prosecutor's comments are found to be beyond the evidence, any error resulting from them was harmless. (*People v. Baptist* (1979), 76 Ill. 2d 19.) Specifically, the State asserts that the testimony of its witnesses comprises a "continuous observation" of defendant from inside the cottage to defendant's arrest. Further, the expert testimony regarding the probability that the glass found on defendant and that from the broken window were from the same pane tends to support defendant's iden-

tity. Additionally, the evidence that defendant had cuts on his head in or around the same area where Simpson hit the intruder supports a finding of defendant's guilt. Therefore, the State contends, the testimony of Caruth regarding this issue is not as crucial as defendant contends, but is merely further evidence of defendant's guilt.

We find that the remark of the prosecutor was an improper description of the light that was shined into the window of the cottage, as the evidence at trial failed to indicate that a "spotlight" was used. The illumination of the area was an important issue at trial, as defendant contested the reliability of the witnesses' identification of him. The testimony of Caruth did indicate, however, that a light, which she identified as a police light, was shined into and illuminated the room just prior to the time that she shouted out the window for help. We find that, in view of all of the evidence presented at trial, any error suffered as a result of the prosecutor's remark was harmless. (*People v. White* (1985), 134 Ill. App. 3d 262, 479 N.E.2d 1121, *cert. denied* (1986), 475 U.S. 1126, 90 L. Ed. 2d 194, 106 S. Ct. 1650.) Similarly, the prosecutor's statement during opening argument that Caruth would testify to being able to see a police car from the window was improper, since Caruth failed to testify to that fact at trial. We find again, however, that any error was harmless, as no prejudice resulted to defendant.

 Third, defendant contends that the prosecutor exacerbated the prejudice to defendant by implying, during his closing argument, that there was a light on in the portion of the cottage which Caruth and Simpson occupied and that a light could be seen from the outside of the cottage. Specifically, defendant points to the prosecutor's comment, "Cheryl saw the light coming up from the first floor go off," and his later statement that "the lights were on in that apartment." Defendant asserts that the evidence at trial indicated that there had been a light on in the *basement*, which went out before the intruders approached Caruth's bedroom, but that there was no light on in or around the bedroom. Defendant contends that the prosecutor's comments constituted a misstatement of the evidence regarding the darkness of the building and the appearance of the exterior of the structure.

In this regard, defendant also points to the prosecutor's comment that defendant should have been aware that someone was inside the cottage because of "the drapes on the window, the fact that he saw lights outside from [*sic*] the time of day." Defendant contends that the prosecutor's comment is an assertion that defendant knew the building was occupied, because defendant could see the light on from the

outside. Defendant asserts that there was no evidence presented from which a conclusion could be drawn that a light in the basement was apparent from outside the building.

The State, on the other hand, contends that the prosecutor's comments concerning the light on in the cottage were based on the evidence and therefore were proper. (*People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363.) The State asserts that defendant is attempting to create the suggestion of confusion where none exists. When the comments of the prosecutor are read in context, the State asserts, it is clear that they were supported by the evidence.

With regard to the first two comments, that there was a light coming from the "first floor" and that there were lights on in the "apartment," we find that these words were reasonable inferences based on the evidence and were not so confusing as to mislead the jury. (*People v. Albanese* (1984), 104 Ill. 2d 504, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061; *People v. Brady* (1985), 138 Ill. App. 3d 238, 485 N.E.2d 1159.) The "first floor" apparently meant the basement, where the evidence shows a light *had* been on. Nor does the word "apartment" specify or necessarily imply that a light was on in the area of the cottage which Caruth and Simpson occupied. The prosecutor's third comment, that defendant "saw lights outside" the cottage, likely *did* imply to the jury that defendant was able to see a light on in the cottage from the outside. The evidence failed to show that any light was visible from the outside of the house, and therefore, the prosecutor's comment was impermissible. We find, however, that this comment alone could not have seriously misled the jury and fails to constitute reversible error. *People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945.

▆▆ Additionally, defendant asserts that in his closing argument the prosecutor distorted the testimony of the State's expert microanalyst. The prosecutor's comment was that the glass sample from the window and that found on defendant "matched." Defendant asserts that the expert's conclusion was not that the glass matched. Rather, the expert testified that while it was possible that the samples came from the same source, it was impossible to exclude other sources. Defendant contends that he suffered prejudice by the mischaracterization of the evidence.

In response, the State asserts that the prosecutor's remarks were consistent with the expert testimony. That testimony indicated that the refractive indexes of the glass samples matched and that a close similarity of a refractive index between pieces of glass is a strong indication that the glass came from the same source.

We find that although the prosecutor's use of the term "matched" simplified the conclusion of the expert regarding the glass samples, nevertheless, the prosecutor's characterization was amply supported by the evidence heard by the jury and did not impermissibly mislead the jury. *People v. Albanese* (1984), 104 Ill. 2d 504, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.

■■ Defendant also asserts that all of the alleged misstatements by the prosecutor are particularly detrimental in this case, since defendant represented himself. Defendant asserts that he was "pitted against more eloquent advocates," and the potential that the jury would be misled was therefore magnified in this case. We find, however, that defendant was sufficiently advised, on numerous occasions during trial court proceedings, of his constitutional right to representation. The record indicates that defendant knowingly and willingly waived that right, and defendant cannot now be heard to complain of the effects of his decision. *People v. Richardson* (1959), 17 Ill. 2d 253; *People v. Tuczynski* (1978), 62 Ill. App. 3d 644, 651, 378 N.E.2d 1200, 1205.

■■ Defendant further contends that during closing argument, the prosecutor mischaracterized the elements of the offense of home invasion. Defendant asserts that the prosecutor misled the jury to believe, contrary to law, that the evidence must show only that defendant knowingly entered a structure, rather than knowingly entered the dwelling place of another. Defendant asserts a mischaracterization of the law concerning defendant's state of mind.

Defendant contends that the prosecutor's misstatement of law mandates a reversal of the conviction. (*People v. Crossno* (1981), 93 Ill. App. 3d 808, 821, 417 N.E.2d 827, 837.) Additionally, defendant asserts that the court's later instructions regarding the elements of the offense failed to cure the prejudice. Defendant relies on *People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 465 N.E.2d 107, in which the conviction was reversed where the prosecutor seriously misstated the law and where the court also found that the fact that the jury was told before *voir dire* examination and during instructions that closing arguments were not evidence did not cure the error. 124 Ill. App. 3d 1041, 1044, 465 N.E.2d 107, 110.

The State responds, and we agree, that defendant's contentions focus on only a portion of the prosecutor's closing statement and fail to consider the prosecutor's remaining remarks. The State correctly points out that the prosecutor told the jury that the judge would instruct them regarding the definition of "dwelling." The prosecutor also reviewed the evidence that showed that the cottage was intended

to be a dwelling. Further, the prosecutor discussed the proof presented that defendant knew or had reason to know that one or more persons were present. The prosecutor's closing argument also properly followed the jury instructions that were given. Further, defendant failed to contest the appropriateness of the jury instruction given at trial. *People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 465 N.E.2d 107, and *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, relied on by defendant, are distinguishable from the instant case since the comments of the prosecutor in the instant case failed to constitute serious misstatements of the law or evidence.

■■ Next, defendant asserts that, in his rebuttal argument, the prosecutor improperly gave his personal opinion regarding a "crucial issue," namely, the credibility of Caruth's testimony concerning defendant's conduct inside the building. (*United States v. Phillips* (7th Cir. 1975), 527 F.2d 1021, 1023.) The record shows that during rebuttal, the prosecutor stated:

"MR. RUBER [State's Attorney]:

\* \* \*

The defendant charges that Cheryl Caruth is not to be believed because she said King Frisby had the gun inside the apartment. *I'm sure she's right.* Either there was more than one gun involved, God knows what the other guy who got away had; or at one point during the home invasion, he simply passed the gun to the accomplice who got away." (Emphasis added.)

The State responds that when viewed in context, the remark is correctly seen as an attempt by the prosecutor to ask the jury to compare the evidence at trial with defendant's claim that Caruth was not credible. The State asserts that similar remarks have been held not to be impermissible. *People v. Patterson* (1986), 140 Ill. App. 3d 421, 488 N.E.2d 1283, *aff'd sub nom., People v. Thomas* (1987), 116 Ill. 2d 290; *People v. Belvedere* (1979), 72 Ill. App. 3d 998, 390 N.E. 2d 1239; *People v. Bragg* (1979), 68 Ill. App. 3d 622, 386 N.E.2d 485.

Further, the State asserts that the isolated comment by the prosecutor could not have "overwhelmed" the jury into finding defendant guilty. Rather, the evidence of defendant's guilt was substantial. Had the jury decided this case solely on the basis of personal opinion regarding the witnesses, then, the State asserts, it would have acquitted defendant of both home invasion and residential burglary or convicted him of both.

We find that the prosecutor's statement was an improper comment on the credibility of the witness, and therefore constituted error. We find, however, that in view of the evidence supporting defendant's

guilt in this matter, the error was harmless.

■■ ■ Finally, defendant argues that the "combined effect" of all of the alleged errors committed by the prosecutor makes reversal necessary. (*People v. Johnson* (1981), 102 Ill. App. 3d 122, 429 N.E.2d 905.) Defendant asserts that although he failed to object to the comments at trial, nevertheless, the prosecutor's improper remarks are reviewable on appeal since they constituted plain error. (*People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 465 N.E.2d 107; *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827; *United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1303.) We disagree. The several isolated comments we found to constitute error were found to be harmless. Nor does the net effect of those comments amount to plain error. Defendant has not suffered substantial prejudice, and therefore reversal is not mandated by the minimal effect of the prosecutor's comments. *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.

## C

■■ Next, defendant contends that the trial court erred in failing to exercise discretion to consider the jury's request to read the testimony of Caruth. Defendant asserts that instead of considering whether a review of the testimony would be helpful, the trial court summarily rejected the jury's request.

The record indicates that after the jury had been deliberating for an unspecified period of time, the judge called them out to ask whether they would conclude deliberations in a short time. The foreman responded that they would not. The court then sent the jurors to dinner. Some time after deliberations resumed, the jurors sent a note to the judge asking if they could read the transcript of Caruth's testimony. The judge responded, "No. None is available." The judge told defendant that generally it takes a couple of days for the court reporter to prepare the transcript. Defendant then requested a 72-hour reprieve. The judge refused and stated that once the jury begins deliberations, they must continue until they are discharged or the jury is hung.

About 45 minutes later, the jury sent out a note that they were deadlocked on both charges. Defendant asked if Caruth's testimony could be read from the court reporter's notes. The judge said "No," and stated that as a matter of policy, such a procedure is not followed. The judge then gave a *Prim* instruction, and the jury resumed deliberations. The following morning, the jury returned the verdict.

Defendant contends that the trial judge's refusal to exercise dis-

cretion to consider the jury's request constitutes error and mandates reversal. (*People v. Autman* (1974), 58 Ill. 2d 171, 176-77; *People v. Queen* (1974), 56 Ill. 2d 560, 565.) Defendant also asserts that the alleged policy referenced by the trial judge contravenes case law, which provides that the trial judge must consider the merits of the jury's request. The judge must consider, among other factors, the circumstances surrounding the jury's request and whether the requested information would be helpful or harmful to the jury's proper deliberation. *People v. Pierce* (1974), 56 Ill. 2d 361; *People v. Taylor* (1981), 99 Ill. App. 3d 15, 424 N.E.2d 1246; *People v. Bell* (1976), 44 Ill. App. 3d 185, 357 N.E.2d 1256.

Defendant maintains that there was ample basis to believe that the jury would have been helped by a review of Caruth's testimony. The testimony of the State's other witnesses was inconsistent with Caruth's testimony regarding her ability to observe defendant and regarding the route that she and Simpson took when they went to the front of the house after the police arrived. A review of Caruth's testimony might have helped to correct the allegedly false and misleading comments of the prosecutor. Even if a transcript was not available, defendant asserts, the court should have considered the possibility of using the reporter's notes instead, and balanced the difficulties in obtaining the testimony against the jury's need to review it. *People v. Rogers* (1982), 110 Ill. App. 3d 410, 415-16, 442 N.E.2d 529, 533-34; *People v. Pallardy* (1981), 93 Ill. App. 3d 725, 730, 417 N.E.2d 851, 855.

The State responds that the record shows that the trial court did exercise its discretion in responding to the jury's request. The judge indicated that a transcript would not be available for several days. The judge's response, the State asserts, indicates the court's unwillingness to delay deliberations unnecessarily. Further, the State points out that Caruth's testimony was given on two different days and comprised 27 pages of transcript; that two different court reporters had recorded her testimony; and that the jury's request came nearly two hours after regular business hours.

The State contends that excusing the jury, even excusing them until the next day, would not have helped. It was already late in the day, and it would have been very difficult for the reporter who was present in court to prepare a transcript for the next day. Further, it was unlikely that the other court reporter would have been available immediately to prepare a transcript of the testimony that she recorded.

Additionally, the State notes that the cases cited by defendant

(*People v. Rogers*) (1982), 110 Ill. App. 3d 410, 442 N.E.2d 529; *People v. Pallardy* (1981), 93 Ill. App. 3d 725, 417 N.E.2d 851) demonstrate the rationale for the trial court's statement that, as a matter of policy, the jury does not hear someone read off the stenographer's notes. That is, such a procedure would pose problems in isolating precise testimony and cause unnecessary delay. The State further contends that the trial judge's reasons for denying the jury's request to review a transcript differed from the policy reason regarding reading from the stenographer's notes. This distinction, the State contends, indicates that the trial judge considered both alternatives, *i.e.*, of obtaining a transcript and of reading from the notes. The State asserts that there is no reason to doubt the trial judge's perception of the relative merits of the alternatives.

We find that the trial court did exercise discretion. *People v. Autman* (1974), 58 Ill. 2d 171, and *People v. Queen* (1974), 56 Ill. 2d 560, cited by defendant, are distinguishable from the instant case since the court in those cases found that the trial judge failed to recognize or assert that he *had* discretion to consider the jury's request. In the instant case, the record indicates that the trial court acknowledged and exercised its discretion, as the trial judge indicated to defendant a reason for declining the jury's request, *i.e.*, the problem with obtaining the transcript.

Additionally, the circumstances surrounding the jury's request indicate that the trial court acted within its discretion in refusing the jury's request. Those circumstances include the fact that it was late in the day, that one of the stenographers was not immediately available, and also the general concern that a trial not be unnecessarily delayed. Similarly, we find that the trial court acted within its discretion in denying defendant's request to have the testimony read from the reporter's notes. We find no abuse of discretion.

IV

Fourth, defendant asserts that the trial court's imposition of a sentence of 30 years' imprisonment was an abuse of discretion in light of defendant's potential for rehabilitation and the level of seriousness of the crime. Defendant asserts that the witnesses he called at trial testified that defendant was self-employed (performing part-time maintenance and repair work) and actively engaged in improving himself and his "future prospects within the community" at the time he was arrested. He was attending class and had gained the respect of those with whom he worked. Further, the record indicates that he is a father whose wife committed suicide during defendant's incarcer-

ation pending trial.

Defendant concedes that he has previous convictions. Defendant asserts, however, that the abuse of discretion in sentencing is apparent in view of the nature of the crime, the fact that only one victim (Lamont Simpson) sustained only minor injuries, the fact that a toy gun was the only weapon used, and the fact that the building entered did not appear to be inhabited. *People v. Nelson* (1982), 106 Ill. App. 3d 838, 846-47, 436 N.E.2d 655, 661; *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 648, 364 N.E.2d 491, 494.

The State responds that the trial court properly sentenced defendant in light of defendant's prior felony convictions and the fact that the subject offense was committed while defendant was on parole. A trial court's sentence will not be overturned unless a clear abuse of discretion is shown. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.

The State asserts that the sentence is within the statutory range for a Class X offense. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(3).) Further, the State asserts that defendant was eligible to receive an enhanced sentence, since he was on parole when the subject incident occurred. The State contends that defendant could have been sentenced to 30 to 60 years for the instant offense, under section 5—5—3.2(b)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(1)). Defendant had three prior felony convictions, for theft, burglary, and armed robbery. The armed robbery conviction is a Class X offense, as provided by section 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 18—2).

The State also contends that the record shows that the trial judge considered defendant's age, social background, and potential for future development in determining the sentence. While the trial court recognized some mitigating circumstances concerning defendant's character, the court also found that defendant's good conduct was erratic and inconsistent. Therefore, the trial court found that a considerable penalty for the offense was appropriate.

Further, the State notes the court's consideration of the fact that the gun recovered was a toy gun. The State asserts, and we agree, that this fact does not necessarily mitigate defendant's guilty conduct, as the witnesses believed that the gun was real, and in light of the fact that defendant's conduct created a dangerous situation. Additionally, the State contends that the fact that Simpson may have suffered only minor injuries should not be considered in the court's determination. The State relies on *People v. Rachel* (1984), 123 Ill. App. 3d 600, 462 N.E.2d 959, to assert that any evidence of an injury is sufficient to sustain a conviction for home invasion. The State also

asserts that a potentially more serious injury was avoided only by the prompt arrival of the police. Further, defendant told Caruth and Lamont Simpson that he intended to rob them, and defendant commented on Caruth's pregnancy as she stood naked before him. These facts, along with the other evidence, the State asserts, would support a sentence of 60 years' imprisonment.

We find no abuse of discretion. The trial court has discretion to impose an appropriate sentence based on the circumstances of each case. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) The circumstances in this case support the trial court's sentence. Home invasion is a Class X offense for which a trial court may impose a sentence of 6 to 30 years' imprisonment. (Ill. Rev. Stat. 1983, ch. 38, pars. 12—11, 1005—8—1(a)(3).) Defendant's history of violent behavior, the dangerous situation he created regarding the subject offense, and the serious nature of the home invasion offense justify the 30-year sentence, which falls within the statutory range of 6 to 30 years.

For purposes of clarity and completeness, we also will address the State's argument regarding an extended sentence. The State contends that defendant was eligible for an extended sentence of 30 to 60 years, under section 5—5—3.2(b)(1) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(1)). For the reasons stated below, however, the State's argument lacks merit.

Section 5—5—3.2(b)(1) provides that a trial court may consider the following factor as a reason to impose an extended-term sentence:

"When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts ***." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(1).)

The State's argument apparently is based on the fact that defendant was convicted in 1974 of the Class X offense of armed robbery. The armed robbery conviction is the same class of offense as the home invasion conviction and arises out of a different series of acts. The State's argument fails, however, since the 10-year statutory requirement has not been met. The armed robbery conviction was entered in March 1974, which is more than 10 years before the entry, in March 1985, of the sentence for the home invasion offense. The Illinois Supreme Court has stated that, for purposes of determining the 10-year period, the date of a conviction is the date of entry of the sentencing order. *People v. Robinson* (1982), 89 Ill. 2d 469, 476-77.

## V

 Finally, as provided in his supplemental *pro se* brief, defendant maintains that the circuit court of Cook County did not have jurisdiction to punish him for a felony offense under the laws of the State of Illinois. Defendant asserts that since article VII, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VII, sec. 6) prohibits a "home rule" unit from defining and providing for the punishment of a felony, the circuit court of Cook County had no authority to punish him and his conviction should be reversed. We agree with the State that defendant's assertion must be rejected, as it is based on a strained misunderstanding of the constitution and laws of the State of Illinois.

 The Illinois Constitution provides that a home rule unit is a county or a sufficiently large municipality. By statute, municipalities are empowered to punish the violators of local ordinances. (Ill. Rev. Stat. 1983, ch. 24, par. 1—2—1.) As the State correctly points out, defendant has not been charged with violating a local ordinance, but rather was indicted for violation of State criminal laws and properly tried in the county circuit court where the charged conduct occurred. (Ill. Const. 1970, art. VI, sec. 9.) We find that defendant's argument lacks merit. In addition, we will not review here the remaining contentions which defendant asserts in his supplemental brief, as they fail to comply with the requirements of Supreme Court Rule 341(e)(7) (87 Ill. 2d R. 341(e)(7)).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNAMARA, P.J., and WHITE, J., concur.