THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARTHUR SMITH, Defendant-Appellant.

First District (2nd Division)   No. 1—89—2984

Opinion filed June 18, 1991.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Gregory Vaci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Arthur Smith, was found guilty by the circuit court of aggravated criminal sexual assault, criminal sexual assault and robbery. The lesser included offense was merged into the greater and defendant was sentenced to an extended term of 40 years in custody of the Department of Corrections. Defendant also received a seven-year sentence for the robbery conviction. He appeals, challenging

whether he was proved guilty beyond a reasonable doubt; he was legally arrested, if not, whether the victim's lineup identification and articles of clothing seized from his home must be suppressed as the fruits of the illegal arrest; and he was erroneously sentenced.

Pursuant to defendant's motion to quash arrest, the circuit court conducted a hearing where the following evidence was adduced. Chicago police officer David Dougherty was at the police station on Monterey Avenue on February 2, 1987, at 7 p.m., where he met Detective Fred Sosinski in the station parking lot. Sosinski was in the midst of an ongoing investigation into a string of recent rapes in the Beverly area and showed Dougherty a police artist's composite sketch of the suspect, based on one of the victims' description. From information previously given to patrol officers at their roll call meetings, Dougherty also knew the suspect's general description and was familiar with the crime pattern. After speaking with Sosinski, Dougherty proceeded with his patrol assignment. About 1½ hours later, he observed defendant crossing the street in the area where the rapes had occurred. In Dougherty's opinion, defendant's physical characteristics "closely matched" those in the composite Sosinski had shown him earlier. Dougherty stopped defendant on the street, asked his name, conducted a protective pat-down search, and handcuffed him. Dougherty instructed officers in another patrol car to take defendant to the station for an interview. As defendant was being led through the back door of the station, Dougherty saw a woman in the station "jump up" and identify defendant as the man who had just robbed her.

Detective Sosinski corroborated Dougherty's description of their meeting. At the time, Sosinski testified, police knew that the assaults had been concentrated between 105th and 112th Streets and from Hale to Longwood Streets and that the suspect was a black male between 25 to 35 years old, 5 feet 7 inches to 5 feet 9 inches tall, weighing between 150 and 160 pounds. At 9 p.m., Sosinski was in the station interviewing a female robbery victim who immediately identified defendant as her assailant as he was being led in. Defendant was then arrested and was later removed to Area 2 Headquarters. Sosinski thereafter contacted the various rape victims in order to conduct a lineup.

At the close of the hearing, the circuit court ruled that, in the totality of the circumstances, Dougherty had probable cause to arrest defendant given (1) the nature of the charges; (2) defendant was in and about the area of the crime; (3) defendant matched the general description of the suspect; and (4) defendant matched the composite drawing. In commenting upon the testimony regarding the sketch, the

court stated that there were "a number of similar general appearances; not even general, specific characteristics that I find in the sketch that are very close to the facial characteristics of [defendant]." The motion to quash arrest was denied.

At trial, the victim testified that on January 14, 1987, at 8:50 p.m., she was walking down South Hale Street when she saw defendant walking toward her. When she crossed the street, defendant also crossed the street. As she was approaching an alley, he came up, grabbed her by the neck, and told her not to do anything or he would kill her. The entrance to the alley was illuminated by a streetlight, and the victim looked at defendant's face for 10 seconds. Defendant wore a green jacket, a gray hooded sweatshirt and dark boots. He put his hand on her mouth and neck, and pushed her farther into the alley, which the victim characterized as "bright" because the snow on the ground "reflected." Moreover, the alley was partially illuminated by the lights from the houses that were on each side and the light from the entrance.

As defendant continued to push her into the alley, the victim looked at him five times. He stopped her and then took off her scarf, tying it around her face so that she could not see. Defendant kept repeating that he would kill her so she did not try to push him away. He searched her pockets, gloves, and bra for money, taking her walkman, a cassette tape, and a quarter. He then pushed her down with his arm and got on top of her. He pulled down her pants, unzipped his pants, and put his penis into her vagina. Although defendant told the victim to touch it and kiss him, she did not cooperate with him. During the sex act, the victim's scarf fell from her eyes, and she again saw defendant's face. When defendant saw her looking at him, he got angry, started to choke her, and told her she had "better do" what he said. He removed his hands from her neck after she nodded to him in agreement. Defendant had held her neck "really tight," and the victim stated that she "couldn't breathe."

The sexual intercourse lasted between one to two minutes, and defendant told the victim not to move until he left. She waited and then proceeded to the police station, two blocks from the alley. There, she stopped officers in a patrol car and reported that she had just been raped, giving them a description of her attacker. They then took her back to the alley and later took her to the hospital.

On February 2, the victim went to Area 2 Headquarters to view a lineup, which consisted of five men. She viewed the lineup only once for two to three minutes and identified defendant as her assailant. She asked each subject to come up to the glass and say something be-

cause she "knew who he was but [she] wanted to make sure." In court, she identified a photograph of the men she viewed in the lineup, indicating defendant as the man she had picked out from the lineup. She also identified a green jacket and a gray hooded sweatshirt, recovered during a search of defendant's home, as the clothes defendant had worn on the night of the attack.

Chicago police officer David Ducar assisted the victim when she ran up to his patrol car and reported the assault. His description of the alley and its lighting matched the victim's.

Serological testimony presented by the State revealed that, based on analyses of the vaginal swab taken from the victim and of samples of both the victim's and defendant's blood types, it was possible for defendant to have deposited his semen in the victim's vagina.

The State rested, and defendant's motion for a finding was denied.

During defendant's case in chief, Chicago police officer David Friel testified that he had read the case report in the assault in question before going out on patrol shortly after January 14. During his previous patrols, he had seen a man whom he considered a likely suspect in the attack three-quarters of a mile from the scene of the attack, wearing a dark green army jacket and dark hiking boots. After interviewing this suspect, Friel wanted to conduct a lineup, but could not do so because the victim was out of town. He subsequently released the suspect.

On cross-examination, Friel stated that he spoke with the victim four days later and showed her an array of photographs which included the man. The victim told him that none of the men depicted was her attacker.

## I

Defendant initially asserts that the State failed to prove his guilt beyond a reasonable doubt, particularly because the victim's identification was "unreliable."

A victim's in-court identification of the accused must contain the following elements: (1) the victim is present at trial to testify as to what occurred between her and the offender and to identify the defendant as the culprit; (2) the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime; and (3) the defendant is physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender. (*United States v. Crews* (1980), 445 U.S. 463, 471, 63 L. Ed.

2d 537, 546, 100 S. Ct. 1244, 1250 (*Crews*).) All three elements are satisfied here. The victim was present at trial; testified as to what took place between her and the defendant; and identified defendant as her attacker. The victim was able to reconstruct the occurrence clearly, and defendant was present to be identified.

■ In addition to the test outlined above, the reliability of an identification is grounded upon the assessment of several other factors, which also must be considered. In *Crews*, the U.S. Supreme Court described these factors as (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention at that time; (3) the existence of any discrepancy between any pretrial description and the defendant's actual appearance; (4) the lapse of time between the crime and the confrontation; (5) any identification of another person prior to a lineup; and (6) the failure to identify the defendant on a prior occasion. *Crews*, 445 U.S. at 473 n.18, 63 L. Ed. 2d at 547 n.18, 100 S. Ct. at 1251 n.18; *People v. Cohoon* (1984), 104 Ill. 2d 295, 300, 472 N.E.2d 403.

■ Applying these factors to the case at bar, the in-court identification of defendant by the victim was properly admitted into evidence. First, the victim had a clear opportunity to view defendant before he blindfolded her. Her testimony revealed that she saw defendant's face when he initially walked past her; when he came up and grabbed her by the entrance to the alley; and when the scarf fell from her eyes during the sexual assault. The victim also looked at defendant five times as he pushed her down the alley. She had sufficient opportunity to observe defendant prior to the attack. (*People v. Frisby* (1987), 160 Ill. App. 3d 19, 33, 512 N.E.2d 1337.) Furthermore, she observed defendant at the entrance to the alley, which was lit by a streetlight. The victim maintained that the alley was "bright" because of the reflective nature of the snow on the ground in addition to lights from the surrounding houses and from the entrance to the alley. Officer Ducar corroborated the victim's account of the lighting in the alley. Since the most important factor of the above analysis is the victim's opportunity to view the offender (*People v. Moore* (1983), 115 Ill. App. 3d 266, 270, 450 N.E.2d 855), these facts alone present reliable identification indicia.

Second, the victim was an interested witness and, as such, she had reason to scrutinize the offender's face with some amount of care and attention. *People v. Frisby*, 160 Ill. App. 3d at 33; *People v. Payne* (1981), 102 Ill. App. 3d 950, 958, 429 N.E.2d 1344, *aff'd in part & rev'd in part* (1983), 98 Ill. 2d 45, 456 N.E.2d 44.

As for the victim's description of the offender to the police, the testimony presented reveals that the victim did in fact describe her attacker to the police; however, the description itself was never elicited from her while she testified. It is impossible to tell from this record, therefore, whether the victim provided police with a description of the offender which was a relatively accurate portrayal of defendant.

Although over two years had passed between the occurrence, January 14, 1987, and the in-court identification made on June 16, 1989, this alone is not dispositive of the issue. In *People v. Dean* (1987), 156 Ill. App. 3d 344, 352, 509 N.E.2d 618, the appellate court upheld an identification made 2½ years after the occurrence, and in *People v. Rodgers* (1972), 53 Ill. 2d 207, 290 N.E.2d 251, an identification made two years later was upheld.

Other factors further strengthen the reliability of the victim's identification. The victim never identified another person as her attacker prior to the lineup, although she had the opportunity to do so when Officer Friel brought her an array of photographs, which included a suspect some police considered the offender. Moreover, she demonstrated a convincing level of certainty when she positively identified defendant as her assailant at the lineup conducted two weeks after the attack. Contrary to defendant's assertions that her lineup identification was weak, the victim's testimony revealed that she "knew who he was" from the outset and had each subject say something in order to "make sure." Defendant's contention that the identification is unreliable must be rejected.

■ A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) Our function upon review is not to retry defendant, but to ascertain whether, after viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) The complainant's testimony here is clear and convincing and sufficient to sustain a rape conviction despite the fact that it is contradicted by the defendant. *People v. Williams* (1983), 115 Ill. App. 3d 276, 279, 450 N.E.2d 851; *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.

■ Considering all the evidence at bar in the light most favorable to the prosecution, including the victim's testimony and identification,

which the circuit court characterized as "clear and accurate," as well as the testimony of the officer who came to her aid, and the serology testimony, a trier of fact could readily find that defendant committed the acts beyond a reasonable doubt.

## II

Defendant next contends that the circuit court's finding of probable cause for arrest constituted manifest abuse and assigns as error the circuit court's denial of his motion to quash arrest and suppress evidence.

■ The question of whether probable cause exists is a common sense, practical question to be determined by the totality of the circumstances. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Generally, probable cause exists when the circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe an offense has been committed and that the person arrested committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Only where a finding of probable cause constitutes manifest error will a reviewing court reverse that ruling.

■ Here, Officer Dougherty had probable cause to arrest based on the fact that defendant fit the general description of the suspect; defendant was in the vicinity of the area where the rapes had been concentrated; and specific facial characteristics of defendant matched those appearing on the police sketch of the suspect previously shown to the arresting officer. Defendant characterizes the police description of the offender as "general"; however, the record reveals that police knew the assailant's race, sex, age, height, and weight. This description, in addition to the sketch, gave police a more than general description upon which to base their investigation. The circuit court, which had the opportunity to view defendant in person and compare him to the sketch, found certain similarities between them. From the photo of defendant contained in the record and the sketch provided to this court, it cannot be said that the circuit court erred in making this finding. The court's ruling on the existence of probable cause was not manifestly erroneous. See *People v. Washington* (1980), 89 Ill. App. 3d 734, 412 N.E.2d 1; *People v. Jenkins* (1975), 31 Ill. App. 3d 910, 335 N.E.2d 87.

Defendant cites *People v. Thomas* (1980), 80 Ill. App. 3d 1121, 400 N.E.2d 1019, in support of his argument; however, *Thomas* is factually distinguishable from the instant case. In *Thomas*, the appellate court affirmed the circuit court's quashing of arrest where the arrest-

ing officer conceded that his arrest was based only on suspicion, following his receipt of a general description of a suspect in an armed robbery which had occurred one hour before. No such acknowledgement was made in the case at bar. Moreover, police here knew much more about the suspect than the police in *Thomas* since, in the instant case, the investigation had been ongoing for several weeks, and officers were aware of the attacker's pattern and the area where the assaults had occurred. Finally, the circuit court in *Thomas* granted defendant's motion to quash thereby resolving credibility issues in favor of defendant.

Since defendant's arrest was lawful, it is unnecessary for this court to address the issue of whether the circuit court should have excluded the identification testimony and the articles of clothing seized from defendant's house where both were obtained during a period of detention following an illegal arrest.

### III

Defendant lastly contends that the circuit court relied upon an improper aggravating factor in sentencing defendant to an extended term of imprisonment, resulting in reversible error. Defendant maintains that the court erroneously considered whether defendant's conduct caused or threatened serious harm to the victim, an element implicit in the crime of aggravated criminal sexual assault.

■ The imposition of a sentence is a matter of judicial discretion in the absence of which the circuit court's determination may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Aggravated criminal sexual assault is a Class X felony (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(c)), with a maximum term of 30 years' imprisonment (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3)). A defendant is eligible for a term of imprisonment in excess of the maximum if the sentencing judge finds certain statutory aggravating factors present. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a).

■ The circuit court did not consider an improper aggravating factor in the case *sub judice*. Defendant concedes that his sentence was within the statutory range of 30 to 60 years by virtue of his 1977 rape conviction alone. The degree of harm caused to the victim may be considered as an aggravating factor in determining sentence even in cases where serious bodily harm is arguably implicit in the offense for which defendant is convicted. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 269, 497 N.E.2d 1138.) At bar, the State sought the maximum 60-year term, noting in aggravation defendant's long criminal history, which included the above-noted rape, as well as robbery and at-

tempted robbery convictions. In mitigation, defendant's counsel argued, *inter alia*, that "there was no great bodily harm in that the victim was not shot, stabbed, or severely beaten." The circuit court specifically rejected this argument, finding the assault, as testified to by the victim, "vicious and brutal." The court also noted defendant's criminal record in addition to the fact that deterrence to others may be considered in sentencing.

Defendant insists that the record evidence does not support the court's finding of brutality. The evidence presented, however, reveals that defendant stalked his victim for at least one block, attacked her from behind by grabbing her neck, repeatedly threatened to kill her and dragged her down a deserted alley. Even before the sexual assault began, defendant blindfolded the victim, frisked her for money, and robbed her. When he caught her looking at him, he choked her so hard that she "couldn't breathe." The record amply supports the circuit court's finding of bodily harm and brutality. For the foregoing reasons, defendant's sentence must be affirmed.

The record here fully supports the circuit court's findings, decision and sentencing in this case. There are no bases upon which to disturb the outcome, and we are obliged to affirm.

Affirmed.

SCARIANO, P.J., and COCCIA, J., concur.